

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-1995

# United States v Velasquez

Precedential or Non-Precedential:

Docket 93-7236

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Velasquez" (1995). *1995 Decisions.* Paper 242.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/242

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-7236


UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS

v.

EDWIN VELASQUEZ,

Appellant.


On Appeal from the District Court of the Virgin Islands,
Division of St. Croix
(D.C. Criminal Action No. 91-cr-00014-01)



Argued April 17, 1995

Before: BECKER, NYGAARD and ROTH, Circuit Judges

(Opinion Filed August 31, 1995)

Michael A. Joseph, Esq. (Argued)
52A Company Street, Suite 1
Christiansted, St. Croix
Virgin Islands 00820
            Attorney for Appellant

W. Ronald Jennings
United States Attorney
James R. Fitzner (Argued)
Assistant U. S. Attorney
1108 King Street - Suite 201
Christiansted, St. Croix

U. S. Virgin Islands  00820
                 Attorneys for Appellees




                         OPINION OF THE COURT



**ROTH**, <u>Circuit Judge</u>:



        In this appeal, defendant, Edwin Velasquez, challenges
the district court's exclusion of the expert witness he proffered
to testify on his behalf on the subject of handwriting analysis
and the lack of standards in that field of expertise.  Velasquez
was convicted on six counts of drug related offenses, including
Count VIII, engaging in a continuing criminal enterprise.  He
appeals only his conviction on Count VIII.

        At Velasquez's criminal trial, the Government relied
upon a handwriting expert, Lynn Bonjour, to link two of
Velasquez's accomplices to certain drug transactions.  As a part
of his defense, Velasquez proposed to call Mark P. Denbeaux, a
Professor of Law at Seton Hall University and an expert "critic"
of the field of handwriting analysis, to assist the jury in
understanding the limitations of the Government's handwriting
testimony.  The district court refused to admit Professor
Denbeaux's testimony.

        In his appeal, Velasquez contends that, if Denbeaux's
testimony had been admitted, the Government might not have

convinced the jury that Velasquez had managed or organized a continuing criminal enterprise involving at least five other people. Velasquez asserts that Denbeaux's proposed testimony might have persuaded the jury to discount the testimony of Lynn Bonjour in which she identified the handwriting on two mailing labels as that of two of Velasquez's associates. Because we find that Professor Denbeaux is qualified to testify as an expert on the limitations of handwriting analysis and because we conclude that the exclusion of his testimony may very well have affected the jury's verdict on Count VIII, we will reverse Velasquez's judgment of conviction on the continuing criminal enterprise offense and remand this case for a new trial on that count.[0]

## I.  **BACKGROUND AND FACTS**

---

[0]Because we are remanding, we will not go on to consider Velasquez's contention that the district court erred by permitting DEA Agent Gregory Thrash to testify regarding the manner in which cocaine is used and distributed and the manner in which drug organizations operate between the Virgin Islands and Florida. In particular, Velasquez asserts that Thrash testified as an expert and that the Government failed to give the required notice of that testimony to the defense.

We conclude that parts of Thrash's testimony do appear to fall within the bounds of expert opinion. He testified not just about the facts of this specific case but generally, from his experience, about drug trafficking organizations, including the persons required to perform different functions in such an organization.

At the time of the trial in 1991, however, the Government was not required to give notice of its expert witnesses. Although Federal Rule of Criminal Procedure 16(a)(1)(E) was amended to require such notice in 1993, even the amended rule requires the Government to give such notice only "[a]t the defendant's request." Fed. R. Crim. P. 16(a)(1)(E). In this appeal, Velasquez fails to allege that he made such a request.

If, at the time of retrial, the defense should request notification of expert witnesses, the Government will have the opportunity to give such notice in a timely manner.

3

Edwin Velasquez was charged with eight counts of criminal activity related to narcotics trafficking:  Count I – conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 845, 846 and 963; Count II – possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1); Count III – possession of a controlled substance on board an aircraft departing from the United States in violation of 21 U.S.C. §§ 955 and 963; Count IV – importation of a controlled substance into the custom territory of the United States in violation of 21 U.S.C. §§ 952(a) and 963; Count V – possession of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); Count VI – simple possession of a firearm in violation of V.I. Code Ann. tit. 14, § 2253(a); Count VII – engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 2 and 1957(a); and Count VIII – engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848.

During a five-day jury trial, the Government called Lynn Bonjour to testify as an expert on handwriting analysis.[0]

[0] Ms. Bonjour's qualifications are extensive.  At the time of the trial, Ms. Bonjour was employed as a Forensic Document Analyst with the U.S. Postal Inspection Service and had been so employed for fourteen and one half years.  In conjunction with her employment, the Postal Inspection Service had certified her as an expert in the field of document analysis.  Previously, she had been employed by the U.S. Treasury Department, Bureau of Alcohol, Tobacco and Firearms as a Document Analyst/Document Analyst Trainee for four years.  App. 125.  In addition to her on-the-job training, Ms. Bonjour had attended courses and seminars throughout the country on handwriting identification and related subjects, including classes at Georgetown University and George Washington University and courses with the Secret Service and FBI.  She was a member of the Mid-Atlantic Association of

4

Defense counsel immediately objected to the admissibility of her testimony, contending that handwriting analysis lacked measurable standards and could not be considered a legitimate science. Following voir dire examination on the admissibility of Ms. Bonjour's testimony, the trial court rejected the defense's arguments that handwriting analysis did not constitute a valid field of scientific expertise. In so doing, the court relied, in part, on Ms. Bonjour's testimony regarding the standards and methodology of handwriting analysis.[0]

The court then permitted Ms. Bonjour to testify as an expert in the field of questioned documents/handwriting analysis. App. 138. Ms. Bonjour testified that, in her opinion, both Velasquez's girlfriend, Glenda Arrindell, and one of his alleged accomplices, Walter McKay, had written a mailing label which had been used to ship drugs. App. 144, 171.

---

Forensic Scientists and a past president of the Questioned Document section of that organization. She has testified as a handwriting expert in approximately 100 court cases in twenty-six different states.

[0] Ms. Bonjour described the procedures that she, and other experts in the field of handwriting analysis, employ as follows: First, the expert determines whether a questioned document contains a sufficient amount of writing and enough individual characteristics to permit identification. After determining that the questioned document is identifiable, the expert examines the submitted handwriting specimens in the same manner. If both the questioned document and the specimens contain sufficient identifiable characteristics, then the expert compares those characteristics, e.g., the slant of the writing, the shapes of the letters, the letter connections, the height of letters, the spacing between letters, the spacing between words, the "i" dots and "t" crosses, etc. App. 136. After making these comparisons, the expert weighs the evidence, considering both the similarities and differences in the handwriting and determines whether or not there is a match.

5

To counter Ms. Bonjour, the defense proffered Mark P. Denbeaux, a Professor of Law at Seton Hall University, to testify on two facets of handwriting analysis:  as a critic of the field of handwriting analysis or, in the alternative, as a handwriting analyst himself.  At the voir dire examination to determine the admissibility of Denbeaux's testimony, he opined that handwriting analysis is not a valid field of scientific expertise because it lacks standards to guide experts in weighing the match or non-match of particular handwriting characteristics.  App. 189-194. By way of example, Denbeaux pointed out that Ms. Bonjour had relied on spacing characteristics (the spacing between lines) to match Velasquez's accomplices with the shipping labels but had failed to consider or explain why other non-matching aspects of spacing (e.g., how the writing was located on the page both vertically and horizontally, indentation, etc.) were not relevant or as persuasive in forming her opinion.  App. 205.

The district court refused to permit Professor Denbeaux to testify either as to the limitations of handwriting analysis generally or as to the limitations of Ms. Bonjour's particular opinions concerning this case.  The court explained that "whether or not handwriting expertise is admissible in a courtroom" is a "legal" question that was resolved against the defense when the court permitted Ms. Bonjour to testify as a qualified expert in the field of handwriting analysis.  App. 182; see also Court's Order and Memorandum, App. 31-34 (Because the court found "that there are standard procedures in the field of handwriting

6

analysis, it refused to admit the testimony of Professor Denbeaux to contradict the court's legal conclusion.").

The defense then sought to have Professor Denbeaux qualified as an expert in handwriting analysis so that he could compare the mailing labels with the handwriting specimens and offer his opinion regarding the authorship of the labels. Again, the court refused to allow Professor Denbeaux to testify. In particular, the court relied on the Professor's lack of formal training and inadequate practical experience in performing handwriting analysis. Although the record reflects that the Professor had considerable knowledge of the field of handwriting analysis,[0] he had never undertaken formal training in handwriting analysis, had never been to a seminar on the subject, and had never been a member of any related professional organization. In addition, Denbeaux had "never been retained to give an opinion about authorship." App. 201. Although on approximately 12 occasions, he had compared handwriting exemplars for the purposes

---

[0] Professor Denbeaux testified that he had conducted eight years of self-directed research on handwriting analysis, during which he had read nearly all of the literature on the subject; had spent four years as a statistical social scientist; had been involved in some capacity regarding handwriting analysis in approximately four court cases; had been named an American Bar Association Fellow for his research related to the creation of a testing mechanism to certify handwriting analysts and validate the accuracy of their identifications; and had collaborated with two co-authors to publish a work challenging the entire field of handwriting analysis based on the lack of empirical testing, selectively chosen premises, and inadequate standards and procedures, see D. Michael Risinger, Mark P. Denbeaux, & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise", 137 U. Pa. L. Rev. 731 (1989).

of making his own identifications, none of these comparisons had been independently corroborated for accuracy.  App. 213.

At the end of the trial, the jury convicted Velasquez on Counts I, II, III, IV, VI and VIII.  The court declared a mistrial as to Counts V and VII.  On July, 10, 1992, Velasquez was sentenced to 292 months imprisonment, a $250 special assessment and a $25,000 fine.  Almost two years later, on May 16, 1994, the court reduced Velasquez's term of imprisonment to 180 months and five years of supervised release, in recognition of cooperation with the government.

Velasquez has appealed only his conviction on Count VIII, illegally engaging in a continuing criminal enterprise involving at least five people other than himself.  He contests the district court's exclusion of Professor Denbeaux's testimony criticizing the field of handwriting analysis.  Velasquez claims that, if Professor Denbeaux had been permitted to testify, the jury might not have accepted Ms. Bonjour's testimony which was essential in connecting two of the necessary five persons to Velasquez's drug operations.[0]

Although Velasquez did not file a formal notice of appeal, he sent a letter to the district court judge shortly

---

[0]Because the limited record on appeal does not expressly identify the number of people involved in the criminal enterprise, we assume that Ms. Bonjour's testimony connecting these two participants with the Defendant's criminal activities was necessary to obtain Defendant's conviction on Count VIII of the indictment, which required that the Defendant occupy a position of control in a ongoing criminal enterprise involving five or more individuals.  See 21 U.S.C. § 848 (1982).  This assumption is bolstered by the Government's failure to allege otherwise in its brief to this Court.

after his sentencing on July 13, 1992, challenging his conviction.  In October of 1992, he requested that the district court treat his July 13, 1992, letter as notice of appeal or, in the alternative, as a motion to file a notice of appeal out of time.  The district court granted his motion on March 31, 1993, and he filed his notice of appeal with this Court on April 5, 1993.  We have jurisdiction over his appeal pursuant to 28 U.S.C. § 1291.

## II.  **STANDARD OF REVIEW**

We review the trial court's ruling on the admissibility of Professor Denbeaux's testimony for abuse of discretion, "`but to the extent the district court's ruling turns on an interpretation of a Federal Rule of Evidence our review is plenary.'"  In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 749 (3d Cir. 1994) (quoting DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 944 (3d Cir. 1990)), cert. denied, 115 S. Ct. 1253 (1995) ("Paoli II").  We review the district court's findings of fact under a clearly erroneous standard.  Sheet Metal Workers Int'l Ass'n Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1278 (3d Cir. 1991).

## III.  **DISCUSSION**

The district court refused to admit Professor Denbeaux's testimony criticizing the lack of standards in the field of handwriting analysis because the court had already concluded that expert testimony concerning handwriting analysis evidence was sufficiently reliable to be admitted pursuant to Federal Rule of Evidence 702.  We believe, however, that, even

though the district court had recognized handwriting analysis as a field of expertise, the court erred as a matter of law in denying the defense the opportunity to criticize the standards employed in that field of expertise.[0]  Professor Denbeaux's testimony as a critic of handwriting analysis would have assisted the jury in evaluating the Government's expert witness.  In excluding Denbeaux's critique, the court ignored the fact that the same considerations that inform the court's legal decision to admit evidence under Rule 702 may also influence the factfinder's determination as to what weight such evidence, once admitted, should receive.  The Government conceded as much, stating that evidence that handwriting analysis is not scientifically credible "goes to [the] weight" that such handwriting evidence should receive.  App. 123.  The district court even acknowledged, in its preliminary consideration of the admissibility of Ms. Bonjour's expert testimony, that Professor Denbeaux's proposed criticism of

---

[0]In his opening brief to this Court, Velasquez also challenges the district court's refusal to qualify Professor Denbeaux as an expert in conducting handwriting analysis.  In his reply brief, however, Velasquez recants this argument, stating unequivocally that "Professor Denbeaux is not an expert in the identification of questioned writings."  Reply Br. at 1; see also Reply Br. at n.1 ("Trial Court erroneously understood that Professor Denbeaux was being put forward as an handwriting expert").  Because of this concession, we need not address the issue of whether Professor Denbeaux was qualified to testify as to his ability —or inability — to identify the handwriting on the exemplars proferred by the Government.  We note, however, that there appears to be a close link between the ability, or not, of an expert generally to recognize the characteristics of handwriting which are described as helpful in identifying the scrivener of an exemplar and the ability, or not, of an expert in a specific case to identify the scrivener of a particular document through the recognition of those same characteristics.

the lack of standards in handwriting analysis might go "to the weight" of the Bonjour testimony.  App. 133.

The axiom is well recognized:  the reliability of evidence goes "more to the weight than to the admissibility of the evidence."  See, e.g.,  United States v. Jakobetz, 955 F.2d 786, 800 (2d Cir. 1992) ("DNA profiling evidence should be excluded only when the government cannot show [a] threshold level of reliability in its data. . . . [T]he court in exercising its discretion should be mindful that this issue should go more to the weight than to the admissibility of the evidence."), cert. denied, 113 S. Ct. 104 (1992).  Because Professor Denbeaux's proffered testimony called into doubt the reliability and credibility of Lynn Bonjour's handwriting testimony, the jury should have been permitted to hear his testimony in order to properly weigh the testimony of Ms. Bonjour.

If the jury had had the opportunity to credit Denbeaux's testimony, criticizing handwriting analysis in general and Ms. Bonjour's testimony in particular, the jury might have discounted Ms. Bonjour's testimony and thereby found that the Government had failed to prove beyond a reasonable doubt that Velasquez's continuing criminal enterprise involved at least five other people -- a necessary element of his conviction on Count VIII.  Thus, we hold that the district court's determination on the admissibility of Ms. Bonjour's handwriting analysis testimony should not be permitted to preclude the jury from hearing other relevant evidence attacking the reliability of her testimony.

Our conclusion that Professor Denbeaux's expert testimony was admissible is consistent with the "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact" which is embodied in the Federal rules of Evidence. DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 956 (3d Cir. 1990). Rule 702, which governs the admissibility of expert testimony, specifically embraces this policy. See Fed. R. Evid. 702 advisory committee's note (expert testimony should be admissible if it will assist trier of fact); Paoli II, 35 F.3d at 741 (Rule 702 has "liberal policy of admissibility").

Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.[0] Paoli II, 35 F.3d at 741–42. Because Federal Rule of Evidence 104(a) requires district courts to make preliminary determinations "concerning the qualification of a person to be a witness, [and] . . . the admissibility of evidence," a district court, when faced with a proffer of expert testimony, must make a preliminary determination as to all of these elements of Rule 702. See Daubert v. Merrell Dow Pharmaceuticals, 113 S. Ct. 2786, 2796 (1993) ("Faced with a proffer of expert scientific testimony, . .

[0]Rule 702 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

. the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.") (footnotes omitted). These preliminary determinations are intended to ensure the reliability of the expert testimony as well as its relevance. Id. at 2795; Downing, 753 F.2d at 1237.

The first requirement of Rule 702 -- that the proposed witness be an expert -- has been liberally construed by this Court. Paoli II, 35 F.3d at 741. "We have held that a broad range of knowledge, skills, and training qualify an expert as such," and have "eschewed imposing overly rigorous requirements of expertise." Id.; see also Hammond v. International Harvester Co., 691 F.2d 646, 653 (3d Cir. 1982) (permitting engineer with sales experience in automotive and agricultural equipment, who also taught high school automobile repair, to testify in products liability action involving tractors).

The second requirement of Rule 702 -- that the expert testify to scientific, technical or other specialized knowledge -- is intended to ensure the reliability or trustworthiness of the expert's testimony. Daubert, 113 S. Ct. at 2795-96.

In Daubert, the Supreme Court held that a district court, when presented with a proffer of expert "scientific" testimony, must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," by considering all relevant factors that

13

may bear on the reliability of the proffered evidence.[0] 113 S. Ct. at 2796-97; Paoli II, 35 F.3d at 742. Scientific evidence is deemed sufficiently reliable if the expert has "good grounds" for his or her testimony, i.e., the expert's opinions are "based on the `methods and procedures of science' rather than on `subjective belief or unsupported speculation.'" Paoli II, 35 F.3d at 742 (quoting Daubert, 113 S. Ct. at 2795). We have cautioned, however, against applying the reliability requirement too strictly, explaining that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone [of admissibility] is helpfulness to the trier of fact." Id. at 744 (internal quotations and citation omitted).

The third requirement of Rule 702 is to ensure that the evidence is relevant or "fits" under the facts of the case. Daubert, 113 S. Ct. at 2795-96. There must be a valid connection between the expertise in question and the inquiry being made in the case. Paoli II, 35 F.3d at 743. When dealing with "scientific" evidence, this element is satisfied if there is a

---

[0] Courts should consider the following suggested factors, in addition to any other applicable factors, in making a preliminary determination regarding the reliability of scientific testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. Paoli II, 35 F.3d at 742 n.8.

14

"connection between the scientific research or test result to be presented, and particular disputed factual issues in the case." United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985); see also Paoli II, 35 F.3d at 742-43.

Is it, however, appropriate to apply the Daubert tests for scientific expert testimony to the field of handwriting analysis?  The Daubert tests have been considered by some courts to be too stringent to employ in considering whether to admit the expert testimony of accountants and construction experts.  See Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19, 25 (2d Cir. 1994) (Daubert clarified standards for evaluating scientific knowledge only and, therefore, does not apply to exclude affidavits of geotechnical and underground-construction experts who were retained to summarize and interpret voluminous, technical data); Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53 (accountant's affidavit summarizing his review of payroll records not inadmissible under Daubert because "that case specifically dealt with the admissibility of scientific evidence"); United States v. Starzecpyzel, 880 F. Supp. 1027, 1040-41 (S.D.N.Y. 1995) (Daubert factors of testability, known error rate, peer review and publication, and general acceptance not applicable to determination of admissibility of testimony by forensic document examiner; "Daubert does not impose any new standard, other than what is found in the text of the Federal Rules of Evidence, for the admissibility of the testimony of nonscientific experts such as harbor pilots or real estate appraisers.").  However, in an exercise of caution, we will review Denbeaux's testimony under

the <u>Daubert</u> tests because those tests are helpful to assist us in our consideration of the expertise in question here. We will therefore examine both Lynn Bonjour's and Prof. Denbeaux's testimony for qualifications, reliability and fitness as those factors have been explicated in <u>Daubert</u>.

In the present case, there is no question that the district court properly admitted Ms. Bonjour's handwriting analysis testimony because her testimony met all three of the requirements of Rule 702. <u>See</u> <u>Government of Virgin Islands v. Sanes</u>, 57 F.3d 338 (3d cir. 1995) (approving district court's decision to admit testimony of professor of linguistics on issues of voice identification). First, Ms. Bonjour is clearly experienced in handwriting analysis. Her qualifications in this regard are extensive, including her more than fourteen years of experience as a Forensic Document Analyst for the U.S. Postal Inspection Service. <u>See</u> <u>supra</u> note 2.

Second, the field of handwriting analysis consists of "scientific, technical or other specialized knowledge" properly the subject of expert testimony under Rule 702. The district court held a hearing at which it made the requisite preliminary finding that the methodology underlying handwriting analysis was valid and applicable to the facts of the present case. In particular, the court questioned Ms. Bonjour as follows:

> COURT: Is [there] a standard methodology when you look at a handwriting specimen?
>
> BONJOUR: Yes.
>
> COURT: Give me a little discussion of what you look for in your analysis. . . .

BONJOUR:  First I look at the questioned writing and look at that to determine whether it's identifiable, whether it has sufficient individual characteristics as opposed to class characteristics.  So that it can be identified.  Whether there is a sufficient amount of the writing for a comparison.  And, once I determine whether or not it is identifiable, then I look at the submitted handwriting specimens for the same purposess [sic], to determine whether they have been naturally written, whether they contain identifiable characteristics, individual characteristics.  I then compare the characteristics.

COURT:   What do you mean by characteristics?

BONJOUR:  Characteristics are the, [sic] slant, the shapes of the letters, the letter connections, the height of the letters, the spacing between letters, spacing between words, the i dots, t crosses.  Every single thing in that writing is a characteristic. They, in order to effect an identification, they have to be demonstrated and if they do not match exactly, I have to have a good reason for why they don't. . . .  Once I have made the comparison, I weigh the evidence I have seen and determine whether or not this is a match or probably a match or I don't know or it is not a match.

COURT:  Is this the protocol you follow in every instance?

BONJOUR:  In every instance.

COURT:  To your knowledge, in your association with other people who are in your field, is this the protocol they follow?

BONJOUR:  Yes, it is.

App. 136–37.  Immediately following this colloquy, the Court admitted Ms. Bonjour as an expert in the field of questioned documents, i.e., handwriting analysis.  App. 138.  We agree with

17

the district court that Ms. Bonjour's proposed testimony concerned "scientific, technical or other specialized knowledge" and was sufficiently reliable to be admissible.

Ms. Bonjour's testimony also satisfied the third requirement -- that the expert's testimony assist the trier of fact. Her testimony, comparing the handwriting of Velasquez's accomplices with the handwriting on the mailing labels used to ship drugs, was of assistance to the jury in determining whether the accomplices had written the labels, a fact at issue in this case. Specifically, Ms. Bonjour's testimony, if credited by the jury, linked two people to Defendant's drug activities where one of the issues at trial was whether Defendant had managed or organized a continuing criminal enterprise involving at least five other persons. Accordingly, the district court correctly admitted Ms. Bonjour's expert testimony on handwriting analysis under Rule 702.

Similarly, Professor Denbeaux's proffered testimony meets all three requirements of Rule 702. First, in light of our liberal interpretation of expertise, the record shows that Professor Denbeaux has sufficient specialized knowledge of the limitations of handwriting analysis to be considered an expert in that regard. See Downing, 753 F.2d at 1229-30 (expert testimony on limitations of eyewitness perception and memory may under certain circumstances satisfy helpfulness test of Rule 702). In particular, we point to the Professor's eight years of self-directed research on handwriting analysis and his co-authorship of a law review article on the subject. See supra note 3. The

mere fact that the Professor is not an expert in conducting handwriting analysis to identify particular scriveners of specified documents does not mean that he is not qualified to offer expert testimony criticizing the standards in the field.

Second, the Professor's proposed testimony criticizing handwriting analysis consisted of "scientific, technical or other specialized knowledge" reliable enough to be admitted under Rule 702.  The Professor criticized the lack of standards and the possibility for error involved in handwriting analysis.  These criticisms could be and, on a limited basis have been, tested; they have been published and subjected to peer review.  See D. Michael Risinger, Mark P. Denbeaux, & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise", 137 U. Pa. L. Rev. 731 (1989) (detailing tests conducted to determine accuracy of handwriting analysts).[0]  We find that sufficient evidence exists to show that the Professor had "good grounds" for his rejection of handwriting analysis.

Finally, the Professor's proffered testimony was highly relevant to the reliability of Ms. Bonjour's testimony.  His criticisms of the field of handwriting analysis generally, as well as Ms. Bonjour's analysis in this case, would have assisted the jury in determining the proper weight to accord Ms. Bonjour's testimony.  His testimony "fits" the facts of the case because

---

[0]Ms. Bonjour acknowledged that she had read Professor Denbeaux's law review article, although her critique -- "it's a lot of gibberish" -- was less than glowing.  App. 164.

his opinions, criticizing handwriting analysis and Ms. Bonjour's conclusions, connect to the issue of whether Defendant's continuing criminal enterprise involved at least five other people.

Thus, in light of the liberal standard of admissibility of Rule 702, Professor Denbeaux's testimony should have been admitted. Moreover, because his testimony bore on the critical issue of Ms. Bonjour's identification of the persons who were required to have participated in Velasquez's "continuing criminal enterprise," his testimony might very well have affected the jury's verdict on Count VIII. We cannot conclude that the district court's decision to exclude that evidence was harmless error.

## IV. **CONCLUSION**

The district court erred as a matter of law in refusing to permit Professor Denbeaux to testify as to the limitations of handwriting analysis. Accordingly, we will vacate Velasquez's judgment of conviction for engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848, and we will remand this case to the district court for a new trial on that count.