**VERONICA ETIENNE, Plaintiff**

**v.**

**UNITED CORPORATION, d/b/a PLAZA EXTRA, Defendant**

Civil No. 205/1999

Territorial Court for the Virgin Islands

Division of St. Thomas and St. John

October 15, 2001

DESMOND MAYNARD, ESQ., St. Thomas, Virgin Islands, *Attorney for Plaintiff*

LAD MINGUS, ESQ., Law Offices of R. Eric Moore, Christiansted, Virgin Islands, *Attorney for Defendant*

MEYERS, *Judge*

## MEMORANDUM OPINION

(October 15, 2001)

THIS MATTER is before the Court on Motion of Plaza Extra United Corporation, d/b/a Plaza Extra ("Plaza Extra") for Summary Judgment and Plaintiff Veronica Etienne's ("Etienne") Opposition thereto. Etienne brings claims against Plaza Extra for negligence and breach of warranty alleging that she contracted *Salmonella Enteritidis* after eating souse prepared by Plaza Extra.

The Court, having reviewed Plaza Extra's motion and Etienne's opposition thereto, along with their accompanying memoranda of law, will enter summary judgment in favor of Plaza Extra.

### I. FACTS

According to Etienne's deposition testimony, on Saturday, June 20, 1998, sometime between 11:00 a.m. and 12:00 p.m., she purchased a container of souse from the deli at Plaza Extra. Within thirty minutes thereafter, she returned home and immediately began to eat it. The souse appeared to be in good condition with nothing out of the ordinary. Etienne further stated at her deposition that the souse was the only food she consumed that day.

According to Plaza Extra, its souse is prepared by cutting up pig feet in the Meat Department for the Deli Department. The Deli Department then places the pig feet in a tub of cold water and white vinegar for a thorough washing. After the pig feet are washed, they are rinsed, placed in a cooking pot, combined with other ingredients,[1] then boiled for approximately four and a half hours until tender. The deli manager and the cook then taste the souse prior to serving. Plaza Extra prepares an

---

[1] Including water, salt, black pepper, garlic, onions, celery, parsley, limejuice, and hot pepper sauce.

average of 60 pounds of pig feet every Saturday and serves approximately 50 plates of souse.

When Etienne awoke the following morning at approximately 6:00 a.m., she began to experience acute abdominal pain, vomiting, and diarrhea. Later that same day, Etienne fell unconscious in her home and was rushed by ambulance to the Emergency Room of the Roy L. Schneider Hospital. Etienne presented to the emergency room with dehydration, fever, vomiting, diarrhea, and continued acute abdominal pain.

Etienne was seen by Doctor Robert Ingham on Monday, June 22, 1998. Testing confirmed that Etienne had contracted *Salmonella Enteritidis*.[2] Dr. Ingham treated Etienne with antibiotics, and she remained in the hospital for several days. Dr. Ingham has since opined that based upon Etienne's history as recounted by her, the souse was the cause of the *Salmonella*.

According to deposition testimony, during the days prior to her illness Etienne ate at home with her aunt and cousins and ate the same food that they ate. Etienne does not recall what specific foods she may have eaten on the days prior to her illness. However, she was the only one of her family who became sick. Similarly, according to Plaza Extra, it has never received a complaint of sickness from consumption of its souse.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

When a party seeks adjudication in the form of summary judgment, the Court is governed by Rule 56 of the Federal Rules of Civil Procedure, as applied by Territorial Court Rule 7. FED. R. CIV. P. 56; TERR. CT. R. 7. Summary judgment is required when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material

---

[2] A person infected with the *Salmonella Enteritidis* bacterium usually has fever, abdominal cramps, and diarrhea beginning 12 to 72 hours after consuming a contaminated food or beverage. The bacterium is found in animals and birds, and is transmitted to humans by contaminated food of animal origin. The illness usually lasts four to seven days. Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment (Plaintiff's Opposition), Exhibit F(1) (Centers for Disease Control and Prevention, Division of Bacterial and Mycotic Diseases, *Salmonella Enteriditis—General Information, at* http://www.cdc.gov/ncidod/dbmd/diseaseinfo/salment_g.htm).

fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying that which it believes demonstrates the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 284 (1986). In order to establish a genuine issue of material fact, the non-moving party must introduce evidence beyond the mere pleadings which, when considered in light of that party's burden of proof at trial, creates an issue of material fact on "an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. The failure to establish any one of these elements is a ground for summary judgment. *Id.* at 322.

In addition, in considering a motion for summary judgment, the trial judge's role " ... is not himself to weigh the evidence and determine the truth of the matter, but to determine whether the evidence creates a genuine issue of material fact which, because [it] may be resolved in favor of either party, properly can be resolved only by a finder of fact." *Metzger v. Osbeck*, 841 F.2d 518 (3d Cir. 1988). Furthermore, any inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Thus, "summary judgment, an extreme remedy, cannot be entered unless the movant has established its rights to a judgment with such clarity as to leave no room for controversy, and the other party is not entitled to recover under any discernable circumstances." *Bottle v. Industrious*, 26 V.I. 83, 85 (Terr. Ct. 1991).

### III. LEGAL ANALYSIS

Etienne has alleged in her complaint that Plaza Extra was negligent in the preparation and sale of souse, causing her to become ill. Etienne further alleges that Plaza Extra breached its express and implied warranties that its food was fit for human consumption. In order to prevail on either count at trial, Etienne must prove that the souse

116

prepared by Plaza Extra was the proximate cause of her injuries. Plaza Extra's Motion for Summary Judgment asserts that there is no genuine issue of material fact on the element of proximate causation, and that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322. Accordingly, to overcome summary judgment Etienne must present specific facts that show that more probably than not, the souse was the proximate cause of her *Salmonella. Id.* at 317.

The record, analyzed in the light most favorable to Etienne, indicates that the evidence relied upon by her to prove causation. is: 1) she ate souse purchased at Plaza Extra; 2) subsequent to eating the souse, and within the 12 to 72 hour incubation period of the disease, she contracted *Salmonella Enteritidus*; 3) in the days prior to her illness, other than the souse, Etienne ate the same foods as her family and was the only one to become sick; and 4) her treating physician, Dr. Ingham, has stated that "to a reasonable degree of medical certainty," the souse is the source of Etienne's *Salmonella*.

As stated above, in ruling on a motion for summary judgment, a court must consider the evidence presented by the non-moving party in light of that party's burden of proof at trial. *Celotex*, 477 U.S. at 317. The authority cited by both parties is clear that *Salmonella* can be contracted in a variety of ways,[3] with symptoms appearing 12 to 72 hours after infection. Based upon the foregoing, one can conclude that the souse from Plaza Extra may have been a possible source of Etienne's illness. However, just because Etienne ate souse purchased from Plaza Extra, and subsequent to that time she contracted *Salmonella*, it does not necessarily follow that the souse was *the most probable source* of the *Salmonella*.[4] This is especially true in light of Etienne's statements at her

---

[3] "Contaminated foods are often of animal origin, such as beef, poultry, milk, or eggs, but all foods, including vegetables may become contaminated." Plaintiff's Opposition, Exhibit F(2) (Centers for Disease Control and Prevention, Division of Bacterial and Mycotic Diseases, *Salmonellosis*, at http://www.cdc.gov/ncidod/dbmd/ diseaseinfo/salmonellosis_g.htm).

[4] Even Etienne's treating physician noted the array of possible sources of Salmonella: "Q. And my point to you, though, is that it could have come up to 72 hours of the time that [Etienne] manifested symptoms. It could have come within anything that she ate that would contain Salmonella within the 72-hour period? A. That's correct." Deposition of Robert Ingham, M.D., p. 12; "Q. But just knowing the etiology of Salmonella there are many other ways she could have gotten Salmonella during that 72 hours [sic] period, would that be correct? A. That's correct." *Id.* at p. 16.

117

deposition that the souse looked, smelled, and tasted fine, and that she was unsure what else she ate in the days prior to her illness.

Similarly, Etienne asserts that, apart from the souse, she ate the same foods as her family and was the only one to become ill—her inference being that the souse had to be the cause of her illness. Plaza Extra, on the other hand, asserts that if its souse contained *Salmonella* more people would have gotten sick, yet no one else has complained about the souse—inferring that the souse could not be the source of Etienne's *Salmonella*. In an attempt to refute Plaza Extra's inference, Etienne points out that even if no one else got sick from Plaza Extra's souse, it does not *ipso facto* mean that the souse was not the source of her illness. Then, using the very argument she just denounced, Etienne declares that because no one else got sick from the foods she ate with her family, those other foods could not be the source of her illness. In weighing these contradictory inferences, it is clear that the strength or weakness of one is equally applicable to the other.

Due to the nature of *Salmonella*,[5] the inference asserted by Etienne does very little to strengthen her proof of causation (because she could have gotten sick from anything she ate without anyone else necessarily becoming sick). As such, in order to prove her element of proximate cause, Etienne must rely almost entirely upon the expert testimony of her treating physician.

■ "Where, as here, essential elements of plaintiff's case are entirely dependent upon expert testimony, the trial judge must act as a 'gatekeeper' to ensure that all expert testimony or evidence to be heard at trial is not only relevant, but also reliable." *Wade-Greaux v. Whitehall Laboratories, Inc.*, 29 V.I. 206, 258 (D.V.I. 1994) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)). In addressing whether Etienne's expert, Dr. Ingham, is qualified to testify as such, the Court must apply evidentiary Rule 702, which states in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

---

[5] "The elderly, infants, and persons with impaired immune systems are at increased risk for serious illness. In these persons, a relatively small number of Salmonella bacteria can cause severe illness." Plaintiff's Opposition, Exhibit F(1), *supra* note 4.

issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702.

■ In *Daubert, supra,* the United States Supreme Court interpreted Rule 702 as having three major requirements: (1) the witness must be an expert; (2) the procedures and methods used in forming the witness' opinion must be reliable; and (3) the testimony must "fit" the factual dispute at issue so as to assist the trier of fact. *Daubert,* 509 U.S. at 591. In addition, Rule 104 requires the judge to determine preliminary questions concerning the admissibility of evidence by conducting a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." FED. R. EVID. 104(a). Accordingly, the Court, acting as a "gatekeeper", must make such a preliminary assessment of whether Dr. Ingham satisfies all of the requirements set forth in *Daubert* before his expert testimony is deemed admissible.

## A. Dr. Ingham Is Not An Expert On Epidemiology

"Unless expert testimony is rendered by a qualified expert, it must be excluded. To render expert opinions, a witness must be sufficiently 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Wade-Greaux,* 29 V.I. at 259 (citing *Hines v. Consolidated Rail Corp.,* 926 F.2d 262, 272 (3d Cir. 1991); FED. R. EVID. 702). The initial inquiry then is whether Etienne's witness, Dr. Ingham, should be deemed an expert in epidemiology.

There is no articulated test, or set of standards, for determining the qualification of a witness as an expert. This determination is left to the discretion of the trial judge. *Government v. Olivera,* 8 V.I. 602, 606 (D.V.I. 1971). "All that is necessary is that the witness have some special or technical knowledge and experience so that he may enlighten laymen (judge and jury) in an area beyond their competence and comprehension." *Id.* Factors to be used in determining expertise qualifications include: education, practical experience, study, research, and general background. *Id.*

Dr. Ingham's practical experience, study, research, and general background for the past twenty-eight years have been in cardiology.[6] He has never had any specialized training in epidemiology.[7] In fact, in his deposition, Dr. Ingham specifically states that he is not an infectious disease expert,[8] and when questioned about the sources of salmonella, he replies, "you will have to defer to somebody else who is an expert in this. ..."[9]

However, the Court must keep in mind that the requirement that a proposed witness be an expert has been liberally construed by the courts. *United States v. Velasquez*, 33 V.I. 265, 274 (3d Cir. 1995). The courts have held that "a broad range of knowledge, skills, and training qualify an expert as such," and have "eschewed imposing overly rigorous requirements of expertise." *Id.* (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994)). An expert is competent to express an opinion if he has a "reasonable pretension to the specialized knowledge on the subject under investigation." *Turbe v. Lynch Trucking, Inc.*, 41 V.I. 146, 150 (Terr. Ct. 1999) (quoting *Arnold v. Loose*, 352 F.2d 959, 962 (3d Cir. 1965)). Accordingly, "he must show at least a general familiarity with the field or that he had some opportunity or means of acquiring special knowledge or experience with reference to the particular question." *Id.*

---

[6] Plaintiff's Response To Defendant's Demand For Production, attached Curriculum Vitae of Robert E. Ingham, M.D., F.A.C.C.

[7] "Q. And in your training, Doctor, did you have any training in epidemiology? A. No." Deposition of Robert Ingham, M.D., p. 3.

[8] "Q. I understand. And you are not holding yourself out as a [sic] expert in this area, anyway. A. I am not an infectious disease expert." Deposition of Robert Ingham, M.D., p. 8.

[9] "Q. Oh, yes, and I didn't mean it that way if that's the way it sounded. I am saying that they are discovering that that is the major source coming—is from the contaminated hens? A. I am not sure I would characterize it as a major source. It is most commonly fecal oral contact from person to person. A common source is also chickens that are under-cooked. That receives a lot of press notoriety. If it's eggs, there are lots of eggs consumed in the country so that that receives a lot of notoriety. But the common day-to-day hum drum Salmonella is probably more commonly—you will have to defer to somebody else who is an expert in this, but until the eggs were discovered there was a lot of Salmonella around before too. And it was commonly put out as fecal oral contact." Deposition of Robert Ingham, M.D., p. 7.

Even under these liberal guidelines, the Court is hesitant to allow expert testimony, on an essential element of Etienne's case, from a treating physician whose specialty is entirely unrelated to the area of infectious diseases. Dr. Ingham would almost certainly be qualified as an expert in general medical principles, and would unquestionably be qualified as an expert in cardiology. Generally speaking, testimony on the indications, diagnosis, and treatment of *Salmonella* would be within the realm of experience of any physician. However, in order to testify on the causation of an infectious disease, especially to boldly state that cause "to a reasonable degree of medical certainty", a proposed expert needs some kind of specialized knowledge on the subject, which Dr. Ingham admittedly does not have. *See, e.g., Arnold*, 352 F.2d 959 (holding an orthopedic doctor lacked expertise to testify that a diabetic coma caused an accident when he admittedly had no special knowledge of diabetes).

Accordingly, Etienne's proposed expert witness, Dr. Robert Ingham, is unqualified to testify as an expert on the proximate cause of her *Salmonella*.

## B. The Procedures And Methods Used In Forming Dr. Ingham's Opinion Are Unreliable

■ In order to prove causation through expert testimony, medical expert witnesses must testify with a reasonable degree of medical certainty. *Turbe*, 41 V.I. at 151 (citing *In re Paoli*, 35 F.3d at 751). However, mere recitation of the talismanic phrase "within a reasonable degree of medical certainty" does not elevate heretofore unreliable conjecture to the realm of admissible expert opinion. "The 'scientific knowledge' requirement of FED. R. EVID. 702 establishes a standard of 'evidentiary reliability'—or 'trustworthiness'—that expert opinion evidence must satisfy before admission. 'Scientific' implies a grounding in the methods and procedures of science. 'Knowledge,' meanwhile, is more than a witness's subjective belief or unsupported speculation." *Wade-Greaux*, 29 V.I. at 261 (citing *Daubert, supra*). Thus, the expert's methodology, the facts underlying the expert's opinion, and the link between the facts and conclusion must all be sufficiently reliable so as to assist the trier of fact in reaching an accurate result. *See Turbe, supra*.

## (1) The Methodology Is Unreliable:

The Court in *Turbe* iterated the appropriate scientific methodology to be employed by a physician when determining the cause of an illness. The method to be utilized in internal medicine is a "differential diagnosis", which involves assessing causation with respect to a particular individual. *Id.* at 154. "Performing physical examinations, taking medical histories, and utilizing laboratory tests all provide significant evidence of a reliable differential diagnosis. *At the core of a differential diagnosis, however, is a requirement that experts rule out obvious alternative causes.*" *Id.* at 155 (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) (emphasis added).

The *Turbe* Court went on to disallow testimony from the plaintiff's expert on the grounds that he had an awareness of obvious alternative causes, yet failed to investigate and rule out these other possible causes. "Because he failed to address this most important requirement for making a reliable differential diagnosis, the methodology employed by [the expert] in forming an opinion as to the cause of Turbe's heart attack is suspect and inherently unreliable, making any opinion so premised unreliable as well." *Id.*

At first glance Dr. Ingham appears to have satisfied the requirements of a reliable differential diagnosis. He took a medical history from Etienne, performed a physical examination on her, and ordered laboratory tests (which established that Etienne had contracted *Salmonella*). However, the record is clear that the medical history obtained from Etienne was cursory and speculative, and more importantly, Dr. Ingham was aware of possible alternative causes, yet failed to investigate or rule out any of these other causes. Dr. Ingham corroborates this in his deposition when he states that Etienne's *Salmonella* could have come from anything she ate, within seventy-two hours, which contained the bacteria.[10] Despite this awareness, Dr. Ingham made no investigation into any other possible sources of the *Salmonella*.

It should be noted that in order to form a reliable opinion, a plaintiff's expert is not required to rule out all alternative possible causes. *Heller*, 167 F.3d at 156. However, as in *Turbe*, Dr. Ingham's failure to rule out

---

[10] *Supra*, at note 5.

any other alternative possible causes leads to a differential diagnosis that is inherently unreliable.

## (2) The Facts Are Unreliable:

Even using a reliable methodology, it is axiomatic that if the facts applied to that methodology are suspect, then the conclusion is unreliable. As such, Dr. Ingham's opinion on causation is even more flawed as it is premised entirely upon Etienne's own statement that she got sick after eating the souse.[11] It is obvious to this Court that a plaintiff/patient's own speculation as to the cause of her illness during the taking of her medical history cannot reliably form the sole foundation of an expert opinion as to that causation. *See, e.g., Warren v. Coca-Cola Bottling Co.*, 166 Ill. App. 3d 566, 519 N.E.2d 1197, 117 Ill. Dec. 30 (Ill. Ct. App. 1988) (holding plaintiff's own speculation is insufficient to establish the necessary inference of causation in order to provide a basis for recovery, and must be discounted as surmise and conjecture). As such, the primary "fact" relied upon to form the opinion of Etienne's expert is inherently unreliable thus rendering the opinion itself unreliable.

## (3) The Link Between The Facts And Conclusion Is Unreliable:

Finally, while the focus must be on an expert's principles and methodology, not on the conclusions they generate, a court must still examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used. *Heller*, 167 F.3d at 153. In this case, there is a logical link between the facts known to Dr. Ingham and his conclusion as to the cause of Etienne's *Salmonella*. It is true that pork is a possible cause of *Salmonella*, and that Etienne ate pork (souse) within the twelve to seventy-two hour incubation period of the disease. In fact, the United

---

[11] "There was no past history of inflammatory bowel disease or other history of chronic irritable bowel. She related the onset of her illness to eating a pork product obtained at Plaza Extra 18-24 hours prior to illness." Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment, Exhibit E, P2. *See also* "Q. Yes, I am saying you are taking it just because she told you that she had pork there that it most likely came from the sous [sic] that she ate? A. It is the most likely source. Q. From her history alone? A. That is all I have to go on." Deposition of Robert Ingham, M.D., p. 12.

States Court of Appeals for the Third Circuit often looks favorably on medical testimony that relies on a temporal relationship between an illness and its causal event. *Id.* at 154. However, "the temporal relationship will often be (only) one factor, and how much weight it provides for the overall determination of whether an expert has 'good grounds' for his or her conclusion will differ depending on the strength of that relationship." *Id.*

In the present case, while the fact that the souse was eaten within the incubation period does link the facts with Dr. Ingham's conclusion, that link is undercut by his failure to investigate any other potential cause of Etienne's *Salmonella.* Similarly, as discussed above, Dr. Ingham's reliance upon Etienne's assertion that she got sick after eating the souse, lends little strength to his conclusion. Thus, the temporal relationship employed by Dr. Ingham, while reliable in the sense that it is logically compatible with his conclusion, is not enough to overcome the deficiencies in his facts and methodology.

Accordingly, although Dr. Ingham states that "within a reasonable degree of medical certainty" the souse was the cause of Etienne's illness, the facts relied upon by Dr. Ingham, as well as the methodology employed by him, are suspect and inherently unreliable. Thus, his opinion as to causation is also untrustworthy. Therefore, even though the temporal relationship creates a link to Dr. Ingham's conclusion, it is not sufficient to save his opinion from its unreliable factual basis and defective methodology.

## C. The Testimony "Fits", But Would Not Assist The Trier Of Fact

The final determination required in the Court's "gatekeeper" function is whether the testimony would "fit" so as to assist the trier of fact. The testimony's helpfulness to the trier of fact "turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results." *Wade-Greaux,* 29 V.I. at 265 (citing *DeLuca by DeLuca v. Merrell Dow Pharmaceuticals,* 911 F.2d 941, 956 (3d Cir. 1990)). In the present case, although the testimony would be on an issue that is relevant to the outcome of the trial, Dr. Ingham's opinion regarding the cause of Etienne's *Salmonella* is unreliable, as noted above. Moreover, the facts relied upon by Dr. Ingham, the "specialized knowledge" of infectious diseases he employed, and the "scientific technique" he utilized are all within the realm of common experience of

any juror. As such, a trier of fact would not need an expert in order to reach a just and accurate result.

In addition, when dealing with expert opinion testimony there is always a danger that a jury will place too much emphasis on an expert's opinion. This is particularly risky where, as here, the expert's opinion is problematic from the beginning. Accordingly, the Third Circuit has articulated that a court should exclude expert testimony if "a jury will give them more than their probative value because of their purported scientific origins." *Id.* at 273 (citing *DeLuca v. Merrell Dow Pharmaceuticals*, 791 F. Supp. 1042, 1057-58 (D.N.J. 1992), on remand from *DeLuca, supra, aff'd*, 6 F.3d 778 (3d Cir. 1993)). The Court also noted that when "an expert witness does not exclude potential alternative causes, the potential for confusion among jurors is 'evident' and is an independent basis for exclusion." *Id.* at 274, n. 2. We are faced with that very situation.

As noted above, the proposed expert opinion in the present case did not exclude any other potential alternative causes. The failure to do so not only affects the integrity of the expert's opinion itself, but also creates an unreasonable potential for confusion among the jurors and therefore must be excluded. Moreover, even though the proposed testimony would theoretically fit the issue of proximate cause, it is not based on any more specialized knowledge or skill than that possessed by the average person sitting as a juror. Similarly, because the expert failed to rule out, or even consider, any alternate causes, any probative value of the testimony is outweighed by the potential for confusion of the jurors.

## IV. CONCLUSION

It is clear from the factors articulated in *Daubert, supra*, that Etienne's expert's testimony must be excluded. Not only is Dr. Ingham not an expert on epidemiology, but also the facts and methodology he relied upon are inherently defective. Similarly, the proposed expert opinion would not appreciably aid the jurors in their decision-making, and there is a danger of undue weight being accorded an already unreliable conclusion. Consequently, Dr. Ingham's opinion as to the cause of Etienne's Salmonella must be excluded pursuant to the Court's "gatekeeper" function expressed in *Daubert, supra.*

Based upon the foregoing, without Dr. Ingham's expert opinion, Etienne has not shown that there is a genuine issue of material fact as to

the issue of proximate cause of her *Salmonella*. As such, Etienne cannot prove that it is more probable than not that Plaza Extra's souse was the cause of her illness. Accordingly, Plaza Extra's Motion for Summary Judgment will be granted. An appropriate Judgment will follow.

## SUMMARY JUDGMENT

In accordance with the Memorandum Opinion of even date, it is

**ORDERED, ADJUDGED, and DECREED** that the Defendant Plaza Extra's Motion for Summary Judgment be and the same is hereby **GRANTED** in its entirety; and it is further

**ORDERED, ADJUDGED, and DECREED** that Plaintiff Veronica Etienne's Complaint against Plaza Extra be and the same is hereby **DISMISSED**; and it is further

**ORDERED** that copies of this Summary Judgment and Memorandum Opinion shall be directed to counsel of record.