IN THE SUPERIOR COURT



**FILED**
January 15, 2026 03:34 PM
ST-2024-CV-00251
**TAMARA CHARLES**
**CLERK OF THE COURT**

**SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

PETER BLOCH

PLAINTIFF,

V.

BOWLINE HOSPITALITY III, LLC *D/B/A*
MAFOLIE HOTEL AND RESTAURANT

DEFENDANT.

CASE NO.: ST-2024-CV- 00251

ACTION FOR DAMAGES

<u>JURY TRIAL DEMANDED</u>

Cite as <u>2026 V.I. Super 2</u>

<u>MEMORANDUM OPINION</u>

¶ 1     **THIS MATTER** is before the Court on the following Motions:

(1) Plaintiff's Motion in Limine re Blood-Alcohol Testimony;

(2) Defendant's Daubert Motion in Limine to Bar Opinions of Todd Gentilucci;

(3) Defendant's Daubert Motion in Limine to Bar Opinions of Dr. Joseph Smolarz;

(4) Defendant's Daubert motion in limine to bar Plaintiff's experts from opining that Plaintiff will develop Alzheimer's, dementia, or Parkinson's disease or require medical care for the same pursuant to V.I.R. Evid 403, 702, and 703;

(5) Plaintiff's Motion in Limine re Hearsay Statement Proffered by the Defendant; and

(6) Defendant's Motion in Limine requesting that the Court:

(A) Bar Plaintiff from presenting argument, evidence and testimony concerning overservice of alcohol and the absence of TIPS Program;

(B) Bar Plaintiff from presenting argument, testimony or evidence that plaintiff would not have fallen over the railing had it been forty-two inches;

(C) Bar Plaintiff from presenting argument, testimony or evidence on the cost of potential future care relating to Alzheimer's, Parkinson's Disease or Dementia;

(D) Bar Plaintiff from presenting argument, testimony or evidence concerning liability insurance;

(E) Bar Plaintiff from presenting argument testimony or evidence concerning subsequent remedial measures;

(F) Bar Plaintiff from presenting argument, testimony or evidence that the blood alcohol measurement taken at the hospital is inaccurate;

(G) Bar Plaintiff from presenting argument testimony or evidence that Defendant intentionally destroyed evidence; and

(H) Bar Plaintiff from introducing medical illustrations into evidence.

For the following reasons, the Court shall grant, in part, and deny, in part, the motions *in limine*.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

¶ 2    On February 7, 2024, Plaintiff Peter Bloch ("Bloch" or "Plaintiff") was a patron of Defendant Bowline Hospitality III, LLC d/b/a Mafolie Hotel and Restaurant ("Mafolie" or "Mafolie Hotel and Restaurant" or "Defendant"). After consuming alcoholic beverages at Mafolie's bar, Bloch proceeded to exit the premises through a stairway. Subsequently, Bloch fell over the railing on the stairway, sustaining serious injuries, including a severe blow to the head. On June 6, 2024, Plaintiff filed a Complaint, claiming that Defendant breached the duty to maintain a safe premises. Specifically, Plaintiff alleged that the stairway's guardrail was too low, failing to meet minimum safety standards. In its Answer, Defendant asserted the affirmative defense of Plaintiff's own comparative negligence, later articulating that Bloch's intoxication was the legal cause of his fall.

¶ 3    After conducting discovery, the parties submitted numerous motions *in limine* to bar physical and expert testimony evidence. On October 1, 2025, Plaintiff moved to bar expert testimony regarding Plaintiff's blood alcohol measurement taken at the Roy L. Schneider Hospital ("Hospital"), as well as any mention of Plaintiff being labelled an "alcoholic." On October 3, 2025, Defendant moved to bar expert testimony from Dr. Smolarz, an Ear, Nose, and Throat doctor ("ENT"). Dr. Smolarz opined on the cost of "smell training," "vestibular" rehabilitation and its associated travel costs, and the increased risk of Plaintiff developing dementia or other neurological diseases. On October 3, 2025, Defendant moved to bar Plaintiff's experts from opining that, due to his traumatic brain injury, Bloch is at an increased risk of developing dementia,

Alzheimer's, or Parkinson's disease. On the same day, Defendant filed a motion to exclude the opinions of Todd Gentilucci ("Gentilucci"), a credit card transaction expert.

¶ 4     On November 14, 2025, Defendant filed an omnibus motion *in limine*. Defendant moved to bar evidence concerning the overservice of alcohol to Bloch and Defendant's failure to provide employees with overservice training according to the Training Intervention Procedures for Servers of Alcohol ("TIPS") program. Defendant further requested that the Court bar expert testimony finding that Plaintiff would not have fallen over the guardrail had it been, at a minimum, forty-two inches high. Defendant also moved to bar argument or evidence of Plaintiff's potential future medical expenses because of an increased risk of developing neurological diseases. Additionally, Defendant moved to bar evidence of reference to liability insurance and the subsequent remedial measure of installing a higher guardrail. Finally, Defendant sought to bar expert testimony opining that Plaintiff's blood alcohol measurement was inaccurate, argument that Defendant intentionally destroyed evidence,[1] and Plaintiff's demonstrative medical illustration. On the same day, Plaintiff moved to bar hearsay statements in an email sent to Defendant's counsel by a representative from ePaymentAmerica, a company that processes credit card payments. Plaintiff's expert, Gentilucci, had relied on the same company's representations to form his opinion.

¶ 5     On December 12, 2025, the Court held a hearing regarding the motions *in limine*. Significantly, Plaintiff withdrew several arguments, including Dr. Smolarz's testimony concerning certain costs for Plaintiff's treatment and Plaintiff's increased risk of developing neurological ailments. Plaintiff also withdrew his assertion that he is entitled to future medical expenses for potentially developing dementia, Alzheimer's, or Parkinson's disease. Plaintiff further conceded

---

[1] This matter has been previously briefed in another motion. The Court issued a separate order addressing the matter.

that Defendant is allowed to impeach Gentilucci's expert opinion with an email to Defendant's counsel from an ePaymentAmerica representative.

## II. LEGAL STANDARD

### A. Motion *In Limine* to Exclude Evidence

¶ 6    "When making a motion in limine, 'the moving party has the burden to show that the evidence is irrelevant or should be excluded.'" *Samuel v. Century Hill, Inc.*, 2021 WL 1564723, *2 (V.I. Super. Ct. 2021) (quoting *In re Asbestos. Catalyst & Silica Toxic Dust Exposure Litig.*, 68 V.I. 507, 520 (V.I. Super. Ct. 2018). "The purpose of a motion *in limine* is to prevent prejudicial evidence, argument, or reference from reaching the ears of the jury. However, a trial court's ruling on a motion *in limine* is preliminary and may change depending on what actually happens in trial." *Id.*

¶ 7    Firstly, the Court must determine whether the evidence sought to be excluded from trial is relevant. *See e.g. Samuel*, 2021 WL 1564723 at *2. Pursuant to Rule 401 of the Virgin Islands Rules of Evidence ("VIRE"), "[e]vidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." "Rule 401 does not require the evidence to be dispositive of a fact in issue: the bar is much lower and simply requires that the evidence makes the existence (or non-existence) of such fact more or less likely." *Samuel*, 2021 WL 1564723 at *2.

¶ 8    Secondly, even if the Court determines that evidence is relevant, the Court may still exclude the evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice; confusing the issues; misleading the jury; undue delay; wasting time; or needlessly presenting cumulative evidence." V.I. R. Evid. 403. However, "because all evidence is inherently prejudicial to the party against whom it is offered, Rule 403 does not bar all prejudicial evidence."

*Alexander v. Virgin Islands*, 60 V.I. 486, 496 (V.I. 2014). Rather, the Rule only excludes "evidence that is so unfairly prejudicial as to outweigh its probative value." *Id.* (citation omitted). Furthermore, confusing or misleading evidence "is evidence that may lure the jury to consider matters other than those in dispute at trial or factors that should not be considered." *Id.* (citations omitted). Lastly, in determining the weight and probative value of the evidence, the Court "must assume that the evidence will be believed by the trier of fact." *Id.*

### B. Motion *In Limine* to Bar Expert Testimony

¶ 9    Rule 702 of the Virgin Islands Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

¶ 10    The Virgin Islands Supreme Court has held that the standard articulated in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is the soundest rule for the Virgin Islands. *Antilles School, Inc. v. Lembach*, 64 V.I. 400, 421 (V.I. 2016). Under *Daubert*, the Court may admit expert testimony into evidence if the following requirements are met: "(1) the expert must be qualified; (2) the expert's opinion must be derived from a reliable process or technique; and (3) the testimony must assist the trier of fact, that is, it must 'fit' the facts of the case." *Arvidson v. Buchar*, 72 V.I. 50, 77 (V.I. Super. Ct. 2019) (quoting *Gerald v. R.J. Reynolds Tobacco Co.*, 2018 V.I. LEXIS 119, *1-2 (V.I. Super. Ct. 2018)). The Court, therefore, serves as a "gatekeeper" of irrelevant or unreliable expert testimony.

¶ 11    A witness is qualified as an expert if the witness has "specialized expertise," through education, training, or simply real-world experience. *Halliday v. Cruise Ship Excursions, Inc.*, 2016 V.I. LEXIS 266, *5 (V.I. Super. Ct. 2016). "Expert testimony must be rooted in the expert's scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue." *Samuel v. United Corporation*, 64 V.I. 512, 524 (V.I. 2016) (citation omitted). "An expert is permitted wide latitude to offer opinions, including those not based on firsthand knowledge or observation." *Arvidson*, 72 V.I. at 77 (quoting *Daubert*, 509 U.S. at 592). The U.S. Supreme Court has found that "evidence which does not relate to any issue in the case is not relevant and, thus, is not helpful" to the trier of fact. *People of the V.I. v. Todmann*, 53 V.I. 431, 440 (V.I. 2010) (citing *Daubert*, 509 U.S. at 591). Notably, however, "[b]ecause 'even an expert's flawed conclusion is capable of helping the factfinder, the court does not have to accept the validity of the conclusion reached by the expert for the evidence offered by the expert to be admissible.'" *Arvidson*, 72 V.I. at 78 (quoting *In re Joy Recovery Technology Corp.*, 286 B.R. 54, 70 (N.D. Ill. 2002)). Additionally, expert testimony that states a determinative, legal conclusion is irrelevant and inadmissible. *Id.* (citing *GE v. Joiner*, 522 U.S. 136, 138-39 (1997)).

¶ 12    Furthermore, "this liberal approach to relevancy demands that this Court 'have considerable leeway in deciding how to determine whether particular expert testimony is reliable.'" *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In determining reliability, the Court may consider factors such as "whether the opinion can be (and has been) tested, whether the theory or technique has been subjected to peer review and publication, what the known or potential rate of error is, and the existence and maintenance of standards controlling the technique's operation." *Antilles*, 64 V.I. at 416 (citing *Daubert*, 509 U.S. at 593-94). "No one factor is dispositive" and "[a]s such, the Court's inquiry must focus solely on principles and

methodology, not on the conclusions generated therefrom." *Gov't of the V.I. v. Jackson*, 47 V.I. 123, 126 (V.I. Super. Ct. 2005) (citing *Daubert*, 509 U.S. at 595). "Reliability requires a detailed inquiry into the methodology used to form the expert's conclusion. This inquiry ensures that the methodology is grounded in good science based on more than mere subjective belief or unsupported speculation." *V.I. Port Auth. v. Callwood*, 2014 V.I. LEXIS 11, *8 (V.I. Super. Ct. 2014) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir. 1994)).

¶ 13    Ultimately, the Court has discretion over whether to admit expert testimony. *Arvidson*, 72 V.I. at 78. Notably, the Court bears in mind that the *Daubert* standard is a "liberal one" and that, generally, Rule 702 favors admitting expert testimony. *Gerald v. R.J. Reynolds Tobacco Co.*, 2018 V.I. LEXIS 119, *2 (V.I. Super Ct. 2018) (citing *Daubert*, 509 U.S. at 595). Furthermore, the Court recognizes that it is for the jury to determine the credibility of the expert opinion. *Arvidson*, 72 V.I. at 77 (citation omitted). Lastly, "the party proposing the admission of a proposed expert's opinion testimony bears the burden of establishing their expert's admissibility requirements utilizing a preponderance of the evidence standard." *Id.* (citing *Gerald*, 2018 V.I. LEXIS 119 at *2).

## III.    DISCUSSION

### A.    Motion *In Limine* Re Blood-Alcohol Testimony

#### i.    Plaintiff's Blood Alcohol Content

¶ 14    Plaintiff asserts that Bloch's blood alcohol level of 220 mg/dL, or 0.22g/dL measured at the Hospital is inaccurate and must be reduced to 0.185 to 0.195 g/dL. In her report, Plaintiff's expert, Dr. Swortwood, finds that, at the time the test was taken at the Hospital, Bloch's true blood alcohol content was less than 0.22  because the Hospital likely tested "serum and not whole

blood."[2] Dr. Swortwood explains that "[s]erum, a blood product, has a higher water content than whole blood, and thus serum contains a higher alcohol content than whole blood."[3] Plaintiff, therefore, argues that informing the jury of the 0.22 serum measurement would be "irrelevant to the issue of the true content of the Plaintiff's blood alcohol content at the incident."[4] Plaintiff further asserts that the evidence should be excluded because mentioning the 0.22 blood alcohol content "would be misleading and unduly prejudicial when both [Plaintiff's and Defendant's] toxicologists have explained why that figure is incorrect."[5]

¶ 15    Bloch's blood alcohol content, whether measured by serum or whole blood, is undoubtedly relevant to this case. In its Answer, Defendant asserts the affirmative defense of comparative negligence, later asserting that Plaintiff was intoxicated from alcohol consumption on the evening of Bloch's fall at Mafolie. Thus, Bloch's blood alcohol content around the time of the accident is essential to this dispute and makes his intoxication more probable than not. *See* V.I. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."). Moreover, the toxicologists' disapproval of the serum test's portrayal of someone's true blood alcohol level does not change the fact that the figure is relevant.

¶ 16    The Court is also disinclined to find that disclosing Bloch's 0.22 measurement, as reported in the Hospital records, to the jury would be misleading. Confusing or misleading evidence "is evidence that may lure the jury to consider matters other than those in dispute at trial or factors that should not be considered." *Alexander*, 60 V.I. at 496. Plaintiff's blood alcohol level is a

---

[2] Pl.'s Mot. In Lim. Re Blood Alcohol Testimony, Ex. 2 at 3.
[3] *Id.*
[4] Pl.'s Mot. In Lim. Re Blood Alcohol Testimony at 3.
[5] *Id.* at 4.

relevant matter in dispute. Informing the jury of Bloch's blood alcohol measurement of 0.22 is not misleading. Plaintiff does not assert, nor does the record show, that the test was performed negligently or misinterpreted in any way. As Dr. Madeleine J. Swortwood explains, hospitals "typically evaluate serum and not whole blood, which is what forensic toxicology labs use when evaluating subject alcohol levels."[6] Thus, there is simply a difference between how hospitals and toxicologists measure blood alcohol levels; this does not mean that the hospital's test is inherently inaccurate and should be automatically disregarded. The toxicologists may explain to the jury this difference in opinion on which test is preferable. *See Alexander*, 60 V.I. at 496 (finding that although the testimony of two witnesses "was contradictory in some instances, the defense had ample opportunity to cross examine each of them and bring these inconsistencies to the jury's attention"). Ultimately, it is for the jury to determine which measurement to rely on in deciding Bloch's level of intoxication. *See id.* at 498 ("The law irrefutably declares that the jury, and not the court, determines the credibility of witnesses in a jury trial.").

¶ 17    The Court does not find it unduly prejudicial to permit the jury to hear that Bloch's serum alcohol concentration at the Hospital was 0.22. "[B]ecause all evidence is inherently prejudicial to the party against whom it is offered, Rule 403 does not bar all prejudicial evidence." *Id.* at 496. Rather, the Rule only excludes "evidence that is so unfairly prejudicial as to outweigh its probative value." *Id.* (citation omitted). Bloch's serum measurement of 0.22 is clearly prejudicial to his case; however, the evidence's probative value is great considering that Defendant's affirmative defense hinges on proving Bloch's intoxication. Any prejudicial effect is minimized by the testimony of the toxicologists explaining the significance of the difference between the serum and whole blood

---

[6] Pl.'s Mot. In Limine Re Blood Alcohol Testimony, Ex. 2 at 3.

measurements. Accordingly, the Court finds that the ethanol serum figure of 0.22 is highly relevant to this matter and barring discussion of the figure for being misleading or unduly prejudicial is unwarranted.

### ii. Dr. Wheatley's Testimony

¶ 18    Plaintiff argues that Dr. Clayton Wheatley, the emergency room doctor who treated Bloch at the Hospital on the night of the incident, should be barred from testifying about Plaintiff's blood alcohol content, in part, because Dr. Wheatley has not been identified as an expert witness by Defendant. However, Dr. Wheatley may testify as a fact witness to those things he perceived while treating Bloch, which are not based on scientific, technical, or specialized knowledge as contemplated by Rule 702 of the VIRE. Under Rule 701 of the VIRE,

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

A fact or lay witness must, therefore, speak only to his or her personal knowledge. This Court has previously held that a doctor or treating physician can be deemed a fact witness so long as the physician testifies only about what he or she perceived, which is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See In re Catalyst Litig.*, 2010 WL 11488772, *4 (V.I. Super. Ct. 2010).

¶ 19    Here, Plaintiff contends that Dr. Wheatley, who treated him in the Hospital's emergency room, may not opine about his blood alcohol content of 0.22. However, it was Dr. Wheatley who submitted Bloch for the test, and he personally observed Bloch and reviewed his test results while Bloch was in the emergency room. Dr. Wheatley is not providing an opinion but rather stating what he observed Bloch's blood alcohol content to be, as reflected in the medical report.

As discussed, Plaintiff does not dispute the validity of the serum test itself and informing the jury of the figure would not be misleading. Furthermore, contrary to Plaintiff's assertion, Dr. Wheatley does not state a belief that the smell of alcohol is "an indication of the amount of alcohol content in one's system."[7] Rather, when asked about the "reason for [the] test intoxication" and the "signs or symptoms that led to" ordering the test, Dr. Wheatley explained that Bloch "had a strong smell of alcohol on his breath and he appeared red-eyed as well as slightly slurring his words."[8] These comments encompass solely what the Doctor perceived. Thus, the Court shall permit Dr. Wheatley to testify as to what he observed when treating Bloch, including his physical state and blood alcohol level.

¶ 20    However, unless Dr. Wheatley is properly identified as an expert, he may not testify about his beliefs regarding whether Bloch's blood alcohol level was higher or lower before arriving at the Hospital. This is opinion testimony that is not based on perception but rather on specialized knowledge. Therefore, Dr. Wheatley is prohibited from opining about Bloch's blood alcohol content before he submitted to the test at the Hospital.

### iii. Identifying Plaintiff as an "Alcoholic"

¶ 21    Plaintiff urges the Court to prohibit Defendant from identifying Bloch as an "alcoholic." In its Opposition, Defendant asserts that it "will not label Plaintiff an alcoholic."[9] Instead, Defendant only intends to submit its toxicologist's testimony regarding "Plaintiff's prior medical history of alcohol use disorder and the number of drinks he consumes on a daily basis, as well as his daily marijuana use."[10] The Court agrees with Plaintiff that Defendant should not be permitted

---

[7] Pl.'s Mot. In Limine Re Blood Alcohol Testimony at 5.
[8] Pl.'s Mot. In Limine Re Blood Alcohol Testimony, Ex. 7 at 4:7-15.
[9] Opp'n to Pl.'s Mot. In Limine Re Blood Alcohol Testimony at 7.
[10] *Id.*

to label Bloch as an "alcoholic." Nothing in the record supports labelling Bloch as an alcoholic. In fact, Defendant's toxicologist, Dr. Harper, provided deposition testimony explaining that Bloch is not considered to be an "alcoholic" but just a "social drinker."[11] Moreover, evidence identifying Bloch as an alcoholic would be unduly prejudicial, regardless of the relevance of his potential alcoholism. Particularly considering the availability of other evidence of Bloch's intoxication at the time of the incident, the probative value of labelling Bloch an "alcoholic" is substantially outweighed by a danger of undue prejudice. Accordingly, the Court shall prohibit Defendant and witnesses from identifying Bloch as an "alcoholic" at trial.

### B. Motion *In Limine* to Bar Testimony that the Blood Alcohol Measurement is Inaccurate

¶ 22    Defendant seeks to bar Plaintiff's toxicology experts from opining that the blood alcohol serum measurement of 0.22 d/gL is inaccurate because it would confuse and mislead the jury. Plaintiff contends that it is the Defendant who should not be allowed to submit evidence of the 0.22 figure because the measurement is inaccurate and therefore misleading. Confusing or misleading evidence "is evidence that may lure the jury to consider matters other than those in dispute at trial or factors that should not be considered." *Alexander*, 60 V.I. at 496 (citations omitted). As Defendant explains, informing the jury of the 0.22 measurement is necessary to "provide the jury with a full clinical picture of Plaintiff's condition, which is highly relevant and probative of Plaintiff's comparative fault."[12] Similarly, the jury should hear the toxicologists' explanation as to how the 0.22 figure is not fully reflective of Bloch's true blood alcohol level. As discussed above, the Court does not find that barring evidence of the 0.22 measurement is

---

[11] Pl.'s Mot. In Limine Re Blood Alcohol Testimony, Ex. 4 at 16:2-11.
[12] Def.'s Omnibus Mot. In Limine at 17.

appropriate. Therefore, the best avenue to resolve this conflict is through cross-examination. Accordingly, the Court will not bar the toxicologists from opining that the blood alcohol measurement was inaccurate.

### C. Motion *In Limine* to Bar Expert Opinions Regarding Plaintiff's Increased Risk of Developing Alzheimer's, Dementia, or Parkinson's Disease

¶ 23    Defendant argues that the Court should bar expert testimony opining that Bloch is at an increased risk of developing dementia, Alzheimer's or Parkinson's disease in the future because the opinion is speculative and otherwise unreliable. The Court disagrees. The Court acknowledges that "nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision." *Schulz v. Celotex Corp.*, 942 F.2d 204, 209 (3d Cir. 1991) (citing *McMahon v. Young*, 276 A.2d 534, 535 (Pa. 1971)). Accordingly, the Court may bar expert testimony that is based on nothing more than unsupported speculation or subjective belief. *See Better Building Maintenance of the Virgin Islands, Inc. v. Lee*, 60 V.I. 740, 753 (V.I. 2014); *V.I. Port Auth.*, 2014 V.I. LEXIS 11 at *8. Although "the particular phrase used should not be dispositive . . . using such language as 'possibility'" may signal whether the expert's opinion is merely speculative. *Better Building*, 60 V.I. at 753 (quoting *Schulz v. Celotex Corp.*, 942 F.2d 204, 208-09 (3d Cir. 1991)). "Phrases like 'strong possibility,' or '20–80% probability,' also invite speculation." *Schulz*, 942 F.2d at 208 (quoting *Chaney v. Smithkline Beckman Corp.*, 764 F.2d 527, 529–30 (8th Cir.1985)).

¶ 24    Upon closer inspection, the physician testimony proffered in this case is not speculative. The neurologists, Dr. David Weisher and Dr. James D. Nelson, opined that Bloch is at risk of

developing "long-term neurological consequences following such an injury,"[13] including Alzheimer's, dementia, or Parkinson's disease. Specifically, Dr. Weisher explained that "[p]atients with [Plaintiff's] type of head injury have 2-3 times the risk of Alzheimer's disease in their expected lifetime. There is also an increased risk of Parkinson's disease."[14] Dr. Weisher further found that "[p]athological reports have demonstrated that harmful chemicals responsible for diseases like Alzheimer's, dementia and Parkinson's, can be released into the brain by trauma."[15] Dr. Nelson similarly agreed that, due to Bloch's "post traumatic head syndrome," he is at an increased risk of developing neurological ailments based on "his brain damage [which] was documented by neuropsychological testing and SPECT scan."[16] Both doctors provided that their opinions were made with "a reasonable degree of medical certainty."[17]

¶ 25    Defendant, however, asserts that "not a single doctor has opined that Plaintiff is more likely than not going to develop either Alzheimer's, dementia or Parkinson's disease. Rather, Plaintiff's medical experts simply opine that he is at an increased risk."[18] Defendant is correct that the doctors do not indicate the likelihood of Bloch actually developing such neurological diseases. However, it is for this reason that the doctors cannot be said to be speculating within the meaning of the law. The doctors' opinion that Bloch is at an increased risk is not simply a subjective belief, lacking any objective support. The record shows that the doctors' opinion is based on the facts of the case, medical testing, and scientific data available to them. Furthermore, the opinions lack uncertain,

---

[13] Pl.'s Opp'n to Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. 6 at 8.
[14] Pl.'s Opp'n to Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. 2 at 4.
[15] *Id.*
[16] Pl.'s Opp'n to Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. 5 at 4.
[17] *Id.* at Ex. 2 at 3; Ex. 5 at 6.
[18] Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's at 3.

speculative language. They affirmatively opine that "to a reasonable degree of medical certainty," Bloch has an increased risk.

¶ 26    Defendant further points out, however, that Plaintiff's vocational expert, Lisa Gay ("Gay"), indicated that she has doubts about the experts' opinions diagnosing Bloch with an increased risk of dementia. Specifically, Gay explained that "narrowing down the likelihood of someone developing dementia is very difficult. So I couldn't say that that crossed that threshold of probability. I can't say for sure that that will be likely for him."[19] Accordingly, Gay decided not to include the medical costs associated with dementia as "part of the main life care plan,"[20] which details the estimated range of expenses Plaintiff is expected to incur in the future based on his injury. However, Gay does not dispute Bloch's increased risk of developing dementia. This opinion, therefore, does not squarely contradict the other experts, and even if it did, it is for the jury to determine the credibility and weight to give these expert opinions. *See Arvidson*, 72 V.I. at 77 (citation omitted). Ultimately, the Court will not bar the experts' testimony as speculative because the doctors used assured language and provided the requisite support for their opinions.

¶ 27    Furthermore, the Court is unpersuaded by Defendant's arguments concerning the reliability of the doctors' methodology. The "grounds for the expert's opinion merely have to be good; they do [not] have to be perfect." *In re Catalyst*, 55 V.I. at 48 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). First, Defendant asserts that Dr. Weisher opined that Bloch's MRI scans do not evidence "accelerated atrophy," which tends to show "whether an individual is going to have or is on the verge of having Alzheimer's."[21] However, after reviewing Bloch's most recent MRI, Dr. Weisher indicated that Bloch is still susceptible to degenerative brain diseases,

---

[19] Def.'s Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. G at 28:2-5.
[20] *Id.* at 28:7-9.
[21] Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's at 4.

finding that the scan "essentially supports [his] initial index of suspicion that the patient's head injury and resulting encephalomalacia has a significant progressive component that warrants consideration."[22] Moreover, the jury is tasked with weighing the opinions of Dr. Weisher and any supporting or competing evidence, not this Court. *See Alexander*, 60 V.I. at 498.

¶ 28    Defendant contends that "Plaintiff's experts fail to perform any differential diagnosis as to whether Plaintiff's complaints are the result of excessive alcohol and/or marijuana use."[23] Dr. Weisher, however, explained that the "lesions that we see on the MRI, these brain lesions are unequivocally, absolutely not caused by alcohol. Any reference to that is laughable. It's just not the case. These lesions that we see in the brain are caused by the fall and only by the fall."[24] This testimony demonstrates that the physicians applied reliable principles and methods by accounting for Bloch's alcohol consumption. Ultimately, the jury must determine the credibility of the expert's opinion that Bloch's alcohol or marijuana use is not consequential to his diagnosis.

¶ 29    Defendant further notes that another expert, Dr. Oppenheimer, recently examined Bloch and found that he has made a "solid recovery."[25] This evidence does not serve to negate the reliability or admissibility of Plaintiff's expert testimony. Rather, the appropriate way to attack the veracity of such testimony is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Arvidson*, 72 V.I. at 77; *see also Braithwaite v. K-Mart Corp.*, 2000 WL 36724491, *3 (Terr. V.I. 2000) (finding that the

---

[22] Pl.'s Opp'n to Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. 9.

[23] Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's at 4.

[24] Def.'s Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. E at 52:12-17

[25] *Id.* at Ex. H at 9.

"[d]efendant's evidence that Plaintiff's condition may improve can be raised on cross-examination of [the expert witness] and is more a matter of weight than admissibility").

¶ 30    The Court does not find that the experts' opinion should be barred because of the potential for the testimony to confuse, mislead, and inflame the emotions of the jury, unduly prejudicing Defendant. Relevant evidence is evidence tending to "make a fact more or less probable than it would be without the evidence [] and . . . the fact is of consequence in determining the action." V.I. R. Evid. 401. Relevant evidence may nonetheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice; confusing the issues [or] misleading the jury." V.I. R. Evid. 403. "Rule 403 does not bar all prejudicial evidence," but rather, the Rule only excludes "evidence that is so unfairly prejudicial as to outweigh its probative value." *Alexander*, 60 V.I. at 496. Confusing or misleading evidence "is evidence that may lure the jury to consider matters other than those in dispute at trial or factors that should not be considered." *Id.* (citations omitted). "The danger of unfair prejudice exists where the evidence has the tendency of appealing to the sympathies of the jury, arousing a sense of horror, provoking an instinct to punish, or otherwise cause the jury to base its decision on something other than the established propositions in the case." *Id.* at 502 (citation omitted). For example, in *Alexander*, the Supreme Court found that a photograph of a deceased victim's smiling face when he was alive was irrelevant and "created the risk of arousing the sympathies of the jury." *Id.* at 503.

¶ 31    First, the expert testimony finding that Bloch is at an increased risk of neurological disorders is certainly relevant to Plaintiff's non-economic damages award. Second, the Court finds that the tendency to confuse or mislead the jury is minimal because Bloch's risk of developing such cognitive disorders is an issue in dispute as it relates to non-economic damages. Lastly, the Court recognizes that mentioning such cognitive diseases like Alzheimer's or Parkinson's may

appeal to the jury's sympathies. However, juries have handled significantly more sensitive information in other cases without letting the sensitive nature of the case impair their impartial judgment. Furthermore, any juror's predisposed prejudice to such cognitive ailments can be adequately mitigated through the *voir dire* process. *See Rivera-Moreno v. Gov't of Virgin Islands*, 61 V.I. 279, 316 (V.I. 2014) (explaining that "empanelled jurors are not presumed to be prejudiced or unqualified"). Moreover, through direct and cross examination, Defendant may delineate to the jury the difference between a person who is simply at an increased risk of developing cognitive diseases, and a person who is actually likely to develop such diseases. Thus, unlike in *Alexander*, the evidence here is relevant, and its probative value is not substantially outweighed by emotionally inflammatory and prejudicial evidence.

### D. Motion in Limine to Bar Argument or Evidence on the Cost of Potential Future Care for Alzheimer's, Parkinson's Disease, or Dementia

¶ 32    Defendant asserts that the Court should bar Plaintiff from introducing evidence or argument seeking to obtain a future medical expenses award for Bloch's potential development of dementia, Alzheimer's, or Parkinson's disease. At the hearing held on December 12, 2025, Plaintiff withdrew the argument regarding Plaintiff's potential future medical costs. Nonetheless, the Court agrees, finding that any award for future medical expenses would be based on mere speculation rather than reasonable medical certainty. "It is well settled that an award for future medical expenses may not be based upon mere speculation." *Better Building*, 60 V.I. at 753 (citation omitted). "If a plaintiff seeks future medical expenses as an element of consequential damage, she must establish with a degree of reasonable medical certainty through expert testimony that such expenses will be incurred." *Id.* (citation omitted). In *Better Building*, the Supreme Court of the Virgin Islands found that an expert's opinion on future medical expenses was not

speculative, because he did not use language indicating the "expenses were merely possible or based on guesswork" or "that his opinion was the product of something less than medical certainty." *Id.*

¶ 33    As Defendant asserts, "none of Plaintiff's experts have opined that Plaintiff is going to develop Alzheimer's, dementia or Parkinson's with a reasonable degree of medical certainty. They only opined that he is at an increased risk."[26] Indeed, the experts do not provide any testimony indicating that Bloch will, in fact, incur future medical expenses with any degree of certainty. Their opinions would necessarily result in a jury applying sheer speculation to conjure up a damages award because the opinions are limited in scope to Bloch's mere increased risk of developing neurological diseases. In fact, Plaintiff's vocational expert, Gay, excluded potential future medical costs associated with dementia in her calculations because "narrowing down the likelihood of someone developing dementia is very difficult."[27] The Court shall, thus, prohibit Gay from introducing such calculations to the extent she included any costs related to Bloch's potential future neurological diseases. Ultimately, it would be inappropriate for Plaintiff to seek future medical expenses without any evidence that Bloch will incur such expenses to a degree of reasonable medical certainty.

¶ 34    On the other hand, Bloch is entitled to claim non-economic damages based on his reasonable fear of developing future neurological ailments, such as Alzheimer's or Parkinson's disease, because of his traumatic brain injury. This Court has found that "[o]rdinarily, a mere risk of future harm or anxiety *without physical injury* is insufficient to establish legal harm." *Louis v. Caneel Bay, Inc.*, 50 V.I. 7, 17 (V.I. Super. Ct. 2008) (emphasis added). Therefore, it follows that

---

[26] Def.'s Omnibus Mot. In Limine at 10.
[27] Def.'s Mot. In Limine Re Alzheimer's, Dementia, or Parkinson's, Ex. G at 28:2-5.

"where an individual has a *reasonable fear* of developing cancer or other asbestos-related conditions *stemming from a present condition*, such fear and anxiety are also compensable." *Id.* (citing *Dunn v. HOVIC*, 28 V.I. 526, 532-33 (3d. Cir. 1993) (emphasis added)). The Court's finding was in reference to the Third Circuit's decision in *Dunn v. HOVIC*, 28 V.I. 526 (3d. Cir. 1993).

> In *Dunn*, the Plaintiff had been repeatedly exposed to asbestos at the workplace for several years and had 'massive' pleural plaques, a demonstrable decrease in lung capacity, pronounced physical effects and multiple physicians had diagnosed him with asbestosis, an asbestos related condition of the lungs. The Court concluded that the demonstrated detrimental impact on Plaintiff's physical health was sufficient evidence for a jury to conclude that Plaintiff was injured. The Court also concluded that his fear of developing cancer and mesothelioma in the future based on his past exposure to asbestos was an injury because he had a "reasonable" fear of future symptoms in light of the present deterioration of his health.

*Louis*, 50 V.I. at 17.

Unlike *Dunn*, in *Louis*, the plaintiffs' claim for damages based on fear of future harm failed because none of plaintiffs' medical evaluations showed any physical injury from exposure to asbestos. Accordingly, this Court held that "no reasonable jury could find that Plaintiffs' brief exposure to asbestos has resulted in a legal injury." *Id.*

¶ 35    Similarly, as Defendant Mafolie highlighted, the District Court of the Virgin Islands has found that mere exposure to asbestos without a present showing of an "asbestos-related disease" does not entitle a plaintiff to damages for fear of being at an "enhanced risk" of developing cancer or another disease. *Purjet v. Hess Oil Virgin Islands Corp.*, 22 V.I. 147, 149-51 (D.V.I. 1986). In support, the District Court cited *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir. 1985), in which the Third Circuit found that exposure to asbestos alone without actual injury to the plaintiff's health is insufficient to support a tort claim. Thus, to prevail on a claim for damages based on fear of suffering from future harm, a plaintiff must provide sufficient evidence that he or

she sustained an initial injury, which thereby causes an increased risk of developing future harm; the plaintiff's fear must be reasonable.

¶ 36    In this case, Bloch has produced sufficient evidence that he sustained a traumatic brain injury that resulted in an increased risk of developing dementia, Alzheimer's or Parkinson's disease. Bloch suffered a serious blow to the head after falling over the staircase rail at Mafolie Hotel and Restaurant. At the Hospital, Bloch underwent a CT scan that, according to Dr. Weisher, showed Bloch sustained a "left subdural hematoma with shift of midline intracranial contusion."[28] Dr. Weisher found that Bloch's injury warranted "emergent medical jet transport to a trauma/neurosurgical facility."[29] Upon subsequent visits to Dr. Weisher's office, the doctor further reported that Bloch suffered "[b]ifrontal and left temporal cerebral contusions" and "a fracture of the left temporal bone that was nondisplaced."[30] Dr. Weisher also found that Bloch's MRI demonstrated "encephalomalacia, indicating permanent brain injury."[31] Dr. Weisher concluded that "[p]atients with this type of head injury have 2-3 times the risk of Alzheimer's disease in their expected lifetime," as well as "an increased risk of Parkinson's disease."[32]

¶ 37    Similarly, the other neurologist, Dr. Nelson, found that "[t]here clearly is evidence of a traumatic brain injury with acute loss of consciousness, post traumatic amnesia . . . disorientation and confusion and there was neuroimaging demonstrating injury."[33] The doctor further identified that "[t]he neurocognitive disorder presented immediately after the occurrence of the TBI and has persisted past the acute post-injury period."[34] In another report, Dr. Nelson surmised that Bloch

---

[28] Pl.'s Opp'n to Def.'s Omnibus Daubert Mot. to Exclude Portions of Pl.'s Expert Opinions, Ex. 1 at 3.
[29] *Id.*
[30] Pl.'s Opp'n to Def.'s Omnibus Daubert Mot. to Exclude Portions of Pl.'s Expert Opinions, Ex. 2, at 2.
[31] *Id.* at 3.
[32] *Id.* at 4.
[33] Pl.'s Opp'n to Def.'s Omnibus Daubert Mot. to Exclude Portions of Pl.'s Expert Opinions, Ex. 3 at 14-15.
[34] *Id.* at 15.

sustained a "closed head injury with non-displaced temporal bone fracture associated with post traumatic memory and sleep disturbances."[35] The doctor ultimately concurred with Dr. Weisher that "there is an increased risk of Alzheimer's and Parkinsons Disease to a reasonable degree of medical certainty."[36]

¶ 38    Accordingly, the record shows that Bloch incurred a serious traumatic brain injury that has increased his risk of developing future neurological diseases. The Court finds that a jury could find that Bloch has a reasonable fear of future harm based on his initial head injury and the expert opinions and will, therefore, permit Plaintiff to seek non-economic damages for his fear of being at an increased risk of developing dementia, Alzheimer's or Parkinson's disease.

### E.  Motion *In Limine* to Bar Opinions of Dr. Joseph Smolarz

¶ 39    Defendant argues that the Court should bar certain portions of Dr. Smolarz's testimony, including his opinions regarding the cost of "smell training," "vestibular" rehabilitation and the associated travel expenses, as well as Bloch's potential risk for neurological ailments. At the December 12, 2025, hearing, Plaintiff withdrew any argument or evidence supporting Dr. Smolarz's 1.2-million-dollar assessment for vestibular rehabilitation and his opinion regarding Plaintiff's increased risk of developing neurological diseases. In his Opposition, Plaintiff also withdrew the argument concerning Dr. Smolarz's testimony on the associated travel costs. In agreement with Plaintiff's withdrawn arguments, the Court's analysis shall follow. The Court agrees with Defendant to the extent that Dr. Smolarz's opinion about the costs surrounding vestibular nerve rehabilitation should be barred for speculation. The Court also finds that Dr. Smolarz is unqualified to testify about Bloch's risk of neurological diseases as an ENT.

---

[35] Pl.'s Opp'n to Def.'s Omnibus Daubert Mot. to Exclude Portions of Pl.'s Expert Opinions, Ex. 5 at 4.
[36] *Id.* at 6.

¶ 40    An expert's opinion must be "based on sufficient facts or data" and be "the product of reliable principles and methods." V.I. R. Evid. 702. In determining the reliability of expert testimony, the Court "must ensure that the methods used by the proffered expert are based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Henry v. Hess Oil Virgin Islands Corp.*, 33 V.I. 163, 175 (D.V.I. 1995) (quoting *Daubert*, 509 U.S. at 579). Although "the particular phrase used should not be dispositive . . . using such language as 'possibility'" may signal whether the expert's opinion is merely speculative. *Better Building*, 60 V.I. at 753 (quoting *Schulz v. Celotex Corp.*, 942 F.2d 204, 208-09 (3d Cir. 1991)).

### i.   Smell and Vestibular Rehabilitation Costs

¶ 41    Defendant argues that the Court should prohibit Dr. Smolarz from testifying about the speculative costs for conducting "smell" and "vestibular" training to treat Bloch's loss of smell and dizziness, respectively.

¶ 42    Dr. Smolarz's opinion on the costs for Bloch's "smell training" is speculative and unreliable only as it pertains to his discussion concerning the millions of dollars a "full workup"[37] may cost. After explaining how much an initial session would cost Bloch to undergo "smell training" at Dr. Smolarz's office, Dr. Smolarz identified an additional procedure that Bloch may elect to help determine whether his nerve was completely severed. Dr. Smolarz opined that it would cost "millions of dollars to try to figure that out."[38] The doctor further noted that it "would be astronomical in cost" and that he does not "even know if a million dollars would cover it."[39] When later asked again about the highest total cost for the "full workup," Dr. Smolarz replied,

[37] Def.'s Ex. Ex. B at 32:8-11.
[38] Def.'s Ex. Ex. B at 32:17-18.
[39] Def.'s Ex. Ex. B at 32:20-22.

"[a]h, man, 1.2 million, something astronomical."[40] Dr. Smolarz also explained that this procedure is only used to "try to find out what the likelihood of [the smell treatment] working is going to be" and that treatment can be done without this procedure.[41]

¶ 43    Dr. Smolarz's estimated cost for the procedure is based solely on subjective speculation. The testimony provides the Court with no principles or methodology on which to analyse the reliability of the estimated figure. Moreover, Dr. Smolarz does not state his opinion with any degree of medical certainty, providing that the cost would be "astronomical" and that he does not "even know if a million dollars would cover it."[42] His unexplained arrival at the 1.2 million figure, after being pressed for a more precise answer, does not evidence an objective, reliable estimate.

¶ 44    Furthermore, the "astronomical" figure is unduly prejudicial to Defendant. Rule 403 excludes "evidence that is so unfairly prejudicial as to outweigh its probative value." *Alexander*, 60 V.I. at 496 (citation omitted). "[W]hen dealing with expert opinion testimony there is always a danger that a jury will place too much emphasis on an expert's opinion. This is particularly risky where... the expert's opinion is problematic from the beginning." *Etienne v. United Corp.*, 2001 WL 1568598, *7 (Terr. V.I. 2001). Dr. Smolarz indicated that treatment for Bloch's loss of smell can be done without this procedure. His opinion, moreover, lacks a reasonable degree of certainty and the use of a reliable methodology. Thus, the Court is particularly concerned with the potential for a jury to award excessive damages based on expert testimony that is "so unfairly prejudicial as to outweigh its probative value." *Alexander*, 60 V.I. at 496 (citation omitted). Therefore, the Court will prevent the Plaintiff from presenting Dr. Smolarz's testimony regarding the costs associated with the procedure determining the extent of nerve severing.

---

[40] Def.'s Ex. Ex. B at 34:1-9.
[41] Def.'s Ex. Ex. B at 43:2-8.
[42] Def.'s Ex. Ex. B at 32:20-22.

¶ 45    Secondly, regarding Dr. Smolarz's reference to the cost for vestibular rehabilitation, the Court finds that the testimony is speculative and is hearsay disguised as an opinion. Dr. Smolarz explained that "the cost of the treatment itself would *probably* be on the order of call it 150 grand up there for let's call it a month."[43] This uncertain language concerning the cost and timeframe of the vestibular treatment indicates an opinion based on unsubstantiated speculation. Moreover, "while an expert may rely upon facts contained in hearsay to form an opinion, the expert may not recite those facts at trial, or at the summary judgment stage, under the guise of an 'opinion.'" *Schrader v. Juan F. Luis Hosp. & Med. Ctr.*, 2016 V.I. LEXIS 236, *11 (V.I. Super. Ct. 2016) (quoting *Sickler v. Mandahl Bay Holding*, 2013 V.I. LEXIS 61, *15 (V.I. Super. Ct. 2013)). Specifically, "an expert witness may rely on hearsay evidence while reliably *applying expertise* to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony." *Id.* (citing *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2002) (emphasis added)). Dr. Smolarz admitted that his "opinion" about vestibular training costs is derived only from what his patients have told him.[44] He does not rely on any expertise to form his opinion. Therefore, Dr. Smolarz is barred from providing speculative, hearsay testimony concerning the cost of vestibular rehabilitation treatment.

### ii. Travel and Accommodation Costs for Vestibular Therapy

¶ 46    The Court may swiftly dismiss Dr. Smolarz's testimony regarding the travel and accommodation costs for vestibular rehabilitation due to mere speculation.[45] Dr. Smolarz admitted

---

[43] Def.'s Ex. Ex. B at 34:21-23 (emphasis added).

[44] Def.'s Ex. Ex. B at 47:23-25.

[45] The Court notes that, in his Opposition, Plaintiff did not argue against the inadmissibility of Dr. Smolarz's opinion regarding the travel and accommodation costs associated with Bloch's vestibular rehabilitation, and in fact, Plaintiff formally withdrew the submission of such testimony. *See* Pl.'s Opp'n to Mot. In Limine to Bar Opinions of Dr. Smolarz at 1 (explaining that "Defendant, Mafolie, does not challenge any of Dr. Smolarz's opinions, except in three limited areas, one of which involves travel costs that is hereby withdrawn, mooting this issue").

that his opinion about the potential travel and accommodation costs necessary to obtain vestibular treatment outside of the U.S. Virgin Islands is speculative and that he was "guessing."[46]

### iii. Dr. Smolarz's Opinion on Neurological Diseases

¶ 47    Lastly, Defendant asserts that Dr. Smolarz's "neurological opinions are unreliable, speculative, beyond his expertise, and needlessly cumulative."[47] The Court agrees with Defendant to the extent that Dr. Smolarz is not a qualified expert in the field of neurology. A witness is qualified as an expert if the witness has "specialized expertise," through education, training, or simply real-world experience. *Halliday*, 2016 V.I. LEXIS 266 at *5. In *Gerald v. R.J. Reynolds Tobacco Co.*, the plaintiff proffered expert testimony regarding "lung cancer causation" from an ENT physician. 2018 WL 4062154, *2-3 (V.I. Super. Ct. 2018). Although not directly specialized in treating respiratory diseases, the physician was certified as a Diplomate with the National Board of Medical Examiners and had other certifications "which would require extensive specialized knowledge, skill, and training in the diagnosis of medical conditions and disease." *Id.* In particular, the Court found that an ENT would have "received relevant training in the diagnosis and treatment of diseases of the respiratory system, of which the nose and throat are a part." *Id.* Furthermore, the physician testified at his deposition that "he has seen approximately 50 confirmed cases of small cell lung carcinoma and has treated about a thousand laryngeal cancer patients." *Id.* Thus, the Court found that the physician had the requisite expertise to opine on a lung cancer diagnosis. *Id.* Contrarily, in *Brathwaite v. Xavier*, the Court found that Dr. Weisher, a neurologist whose testimony is also proffered in this case, was not qualified as an orthopaedic to opine about a shoulder surgery. 2017 WL 11596560, *4-5 (V.I. Super. Ct. 2017). The Court noted that Dr.

---

[46] Def.'s Ex. Ex. B at 44:8-11; 47:6-9.
[47] Def.'s Mot. In Limine to Bar Opinions of Dr. Smolarz at 10.

Weisher, in fact, referred the plaintiff to an orthopaedic doctor, indicating Dr. Weisher's lack of expertise in the subject. *Id.*

¶ 48    Here, the Court finds that Dr. Smolarz, an ENT, is unqualified as an expert to testify about neurological ailments. Unlike in *Gerald*, the record does not support finding that Dr. Smolarz has adequate education, training, or experience diagnosing and treating neurological diseases such as dementia. Dr. Smolarz's practice focuses on the ear, nose, and throat. Neurology is a specialized field that requires sufficient education and training to grasp the complexities of the innerworkings of the brain and nervous system. Dr. Smolarz testified in his deposition that, for Bloch's examination, he "looked at the cranial nerves . . . to discern on his hearing test if it's neurologic or conductive."[48] Though Dr. Smolarz's practice includes some neurological examination, such examination does not require the same analytical expertise as diagnosing and treating a cognitive disease. Dr. Smolarz has not provided any certifications or prior experience to substantiate his credentials as an expert in neurological disorders. Additionally, like in *Brathwaite*, Bloch sought a neurological diagnosis from two other neurologists, indicating Dr. Smolarz's lack of qualified expertise.

¶ 49    Furthermore, the reliability of the methodology Dr. Smolarz used is questionable. Dr. Smolarz admitted that he relied solely on the literature provided by Dr. Weisher to form his opinion about Bloch's increased risk of developing neurological disorders. He did not cite any sources he personally found to support his opinion; rather, he appears to merely regurgitate what the neurologists have identified. Ultimately, Dr. Smolarz is not qualified to render an opinion on

---

[48] Def.'s Ex. B at 6:5-10.

Plaintiff's increased risk of developing neurological ailments, including dementia, Alzheimer's, and Parkinson's disease.

### F. Motion *In Limine* to Bar Opinion of Todd Gentilucci

¶ 50    Defendant argues that the expert opinion of Todd Gentilucci ("Gentilucci") should be barred because (1) the testimony is based solely on hearsay and is not derived from specialized knowledge; (2) the opinion is unhelpful and (3) would confuse the jury. The Court is unpersuaded by all these arguments.

¶ 51    The Court does not find that Gentilucci's opinion is merely hearsay without an explanation supported by specialized knowledge. "While an expert may rely upon facts contained in hearsay to form an opinion, the expert may not recite those facts at trial, or at the summary judgment stage, under the guise of an 'opinion.'" *Schrader*, 2016 V.I. LEXIS 236 at *11 (quoting *Sickler*, 2013 V.I. LEXIS 61 at *15). Specifically, "an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony." *Id.* (citing *Dukagjini*, 326 F.3d at 58); *see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1313, 1322 (E.D. Pa. 1980) (explaining that expert opinion which incorporates hearsay is "a widely-recognized exception to the rule against hearsay testimony. It has long been the rule of evidence in the federal courts that an expert witness can express an opinion . . . even though his opinion is based in part or solely upon hearsay sources"). Furthermore, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." V.I. R. Evid. 703. Ultimately, "[e]xpert testimony must be rooted in the expert's scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue." *Samuel*, 64 V.I. at 524 (citation omitted). An expert's

"specialized expertise" may be achieved through education, training, or real-world experience. *Halliday*, 2016 V.I. LEXIS 266 at *5. "An expert is permitted wide latitude to offer opinions, including those not based on firsthand knowledge or observation." *Arvidson*, 72 V.I. at 77 (quoting *Daubert*, 509 U.S. at 592).

¶ 52     Plaintiff's expert, Gentilucci, has formed an opinion containing hearsay statements based, however, on specialized knowledge and facts upon which other experts in credit card transactions would reasonably rely. Through his years of experience working as the local representative in the U.S. Virgin Islands for ePaymentAmerica, a credit card processing company, Gentilucci has expertise in how credit card transactions are processed.[49] In particular, his experience taught him that

> credit card charges at various bars and restaurants may have a time stamp set for another time zone, such as Eastern Standard Time, where the credit card company is located. Such credit card time entries can be adjusted to Atlantic Standard time at the request of the bar or restaurant, which I did from time to time if requested to do so.[50]

In his report, Gentilucci explained how he contacted the "epaymentAmerica customer support line" to determine when the credit card transactions actually occurred in St. Thomas, which is on Atlantic Standard Time.[51] Gentilucci reported that the representatives told him that the transactions were recorded as being authorized on "2/7/2024 at 6:36 PM EST" and "2/7/2024 at 6:40 PM Eastern Standard Time."[52] Based on this information, Gentilucci opined that the credit cards were charged at 7:36 PM and 7:40 PM Atlantic Standard Time. In his deposition, Gentilucci expounded that

---

[49] Pl.'s Opp'n to Mot. In Limine to Bar Gentilucci's Opinion, Ex. 5.
[50] *Id.*
[51] *Id.*
[52] *Id.*

It really doesn't matter what time the credit card receipt says, it's the time that the authorization hits the data platform. So, credit card machines can read different dates and times at all times. But when that processor gets the transaction and the authorization code goes through that is the official timestamp. So, when I called, that representative was able to reference the specific timestamp done on the platform, and that's what said what time it would be.[53]

¶ 53     Thus, Gentilucci is not simply reciting what the representatives told him without applying his expertise to form his opinion. Gentilucci has permissibly used information "not based on firsthand knowledge or observation" to articulate his expert opinion that the credit card transactions occurred an hour later on Atlantic Standard time. *Arvidson*, 72 V.I. at 77 (quoting *Daubert*, 509 U.S. at 592). Therefore, the opinion falls within the expert opinion hearsay exception. Furthermore, the representative's timestamps may be referenced in Gentilucci's opinion because such data is of the type that experts like Gentilucci "would reasonably rely on" to form an opinion. *See* V.I. R. Evid. 703. As Gentilucci declared under oath, "[a]nyone with expertise in credit card transactions knows the only way to get the information I obtained as to the exact time that specific credit card charges were made by the Plaintiff is to call the credit card company, as this information is only on their server."[54]

¶ 54     Moreover, the Court is unpersuaded by Defendant's assertion that Gentilucci's opinion is unreliable because he "failed to provide any of the underlying information and data that would verify his conclusions." One of the factors the Court may consider in determining reliability is "whether the opinion can be (and has been) tested." *Antilles*, 64 V.I. at 416 (citing *Daubert*, 509 U.S. at 593-94). As Plaintiff points out, "Gentilucci provided the contact information for epaymentAmerica right after his deposition, which was provided to defense counsel so that they,

---

[53] Pl.'s Opp'n to Mot. In Limine to Bar Gentilucci's Opinion, Ex. 4 at 15:11-22.
[54] Pl.'s Opp'n to Mot. In Limine to Bar Gentilucci's Opinion, Ex. 7.

or their client (Mafolie), could make the same calls he did."[55] Thus, Gentiluci's opinion can easily be tested by Defendant simply contacting "epaymentAmerica" to verify the accuracy of the facts relied upon by Gentilucci. Additionally, the fact that Gentilucci failed to "inspect the point of sale machines at Mafolie"[56] does not diminish the otherwise reliable technique employed by Gentilucci. *See In re Catalyst,* 55 V.I. at 48 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 744) ("[G]rounds for the expert's opinion merely have to be good; they do [not] have to be perfect"). Ultimately, the record does not put into serious question the reliability of the methods used by the expert to reach his conclusions.

¶ 55 Alternatively, Defendant argues that Gentilucci's expert testimony does "not fit the facts of this case and are thus unhelpful."[57] Under *Daubert,* "the [expert's] testimony must assist the trier of fact, that is, it must 'fit' the facts of the case." *Arvidson,* 72 V.I. at 77 (quoting *Gerald,* 2018 V.I. LEXIS 119 at *1-2). "[E]vidence which does not relate to any issue in the case is not relevant and, thus, is not helpful" to the trier of fact. *People of the V.I. v. Todmann,* 53 V.I. 431, 440 (V.I. 2010) (citing *Daubert,* 509 U.S. at 591). However, "[b]ecause 'even an expert's flawed conclusion is capable of helping the factfinder the court does not have to accept the validity of the conclusion reached by the expert for the evidence offered by the expert to be admissible.'" *Arvidson,* 72 V.I. at 78 (quoting *In re Joy Recovery Technology Corp.,* 286 B.R. 54, 70 (N.D. Ill. 2002)).

¶ 56 Specifically, Defendant claims that "the times identified in the Report are contradicted by other evidence in the record, which Gentilucci admittedly did not review."[58] For example,

---

[55] Pl.'s Opp'n to Mot. In Limine to Bar Gentilucci's Opinion at 10.
[56] Def.'s Mot. In Limine to Bar Opinions of Todd Gentilucci at 5.
[57] *Id.*
[58] *Id.*

Defendant asserts that "a text message from Mark Robinson and his corresponding testimony contradict this 'opinion'" that the credit card receipts are irreflective of the true time in St. Thomas.[59] However, this purportedly contradictory evidence goes to the credibility of the expert, rather than admissibility. *See Arvidson*, 72 V.I. at 77 (citation omitted) (explaining that it is for the jury to determine the credibility of the expert opinion). Moreover, the Court reiterates that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Arvidson*, 72 V.I. at 77. Regardless, Defendant fails to articulate how Gentilucci's opinion would be unhelpful to the jury in determining a fact or issue in the case. Indeed, the opinion will undoubtedly help the trier of fact understand the timeline of events leading up to the accident and ultimately the issue of liability.

¶ 57    Lastly, the Court does not find that Gentilucci's opinion will confuse the jury. Confusing or misleading evidence "is evidence that may lure the jury to consider matters other than those in dispute at trial or factors that should not be considered." *Alexander*, 60 V.I. at 496 (citations omitted). The timeline of events showcased by Gentilucci's explanation of the credit card transactions is a factor in dispute that the jury should be allowed to consider. The expert opinion is not overly complex and will aid the jury's understanding of the case, instead of distracting it. Accordingly, the Court shall not bar Gentilucci's expert opinion, which is reliable, based on specialized knowledge, and helpful to the trier of fact.

---

[59] *Id.*

### G. Motion *In Limine* Re Hearsay Statement Proffered by Defendant

¶ 58    Plaintiff submits that the Court should bar certain hearsay statements contained in an email, which Defendant attached as support to its Reply to the motion to exclude Gentilucci's expert testimony. At the hearing held on December 12, 2025, Plaintiff conceded that Defendant may use the statements contained in the email to impeach Gentilucci. The Court found that the evidence is permitted for impeachment purposes, as well as admissible evidence under the residual exception to hearsay. Under Rule 607 of the VIRE, any party may impeach a witness's credibility, and the evidence used to impeach need not be admissible. Under Rule 807, "a hearsay statement is not excluded by the rule against hearsay" so long as

> (1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

¶ 59    Here, the email contains hearsay statements that contradict the evidence Gentilucci relied upon to form his expert opinion; thus, Defendant may use the email to impeach Gentilucci's credibility. The email, which was sent to Defendant's counsel from a representative at "epayment America," explains that "the time stamp of the transaction will be the same time zone that the Clover Dashboard is set for. So in this case is the Virgin Islands, Atlantic Standard Time zone."[60] Thus, this statement calls into question the credibility of Gentilucci, who claimed that the credit card company representatives told him that the payment transactions at Mafolie were recorded

---

[60] Mot. In Limine Re Hearsay Statement, Ex. 1.

according to Eastern Standard Time, instead of Atlantic Standard Time. Therefore, Defendant may use this email to impeach Gentilucci.

¶ 60    Moreover, the email's hearsay statements may be admitted into evidence under the residual hearsay exception. The email is sufficiently trustworthy. The email shows that it was sent by an "epayment America" address to Defendant's counsel. Furthermore, as Plaintiff points out, Gentilucci provided Defendant with the credit card company's contact information, insisting that Defendant was free to confirm the timestamp logs itself. Defendant did so, and, unlike Gentilucci, Defendant recorded the hearsay statements as written evidence, which can be reviewed by the trier of fact for its veracity. Additionally, the email's probative value is high, and it is the best evidence available to Defendant that could reasonably be obtained. Accordingly, the Court will permit Defendant, with the proper foundation, to introduce into evidence the email sent by the "epayment America" representative.

### H. Motion *In Limine* to Bar Evidence of Overservice of Alcohol and the Absence of a TIPS Program

¶ 61    Defendant asserts that Plaintiff should be barred from introducing evidence that Mafolie's employees negligently overserved Bloch alcohol or that Mafolie failed to properly train employees about overservice according to the TIPS program. The Court agrees. In support, Defendant cites the following Virgin Islands statute, which states:

> A person who sells or furnishes alcoholic beverages to a person of lawful drinking age does not thereby become liable for injury or damage caused by or resulting from the intoxication of such person. However, a person who willfully and unlawfully sells or furnishes alcoholic beverages to a person who is not of lawful drinking age, or who knowingly serves a person habitually addicted to the use of

> any or all alcoholic beverages may become liable for injury or damage caused by
> or resulting from the intoxication of such minor or person.

8 V.I.C. § 161. Defendant asserts that none of the exceptions apply in this case, and therefore, Plaintiff is statutorily barred from arguing that Defendant shares any liability for Bloch's injury based on aiding his intoxication through bartenders' overservice of alcohol. Plaintiff contends that the statute's "plain text" indicates that the statute is only "designed to protect bar owners from suits by injured third parties where an intoxicated patron leaves and injures another person."[61]

¶ 62    It is well settled that "[i]f it is not ambiguous, the plain text of a statute governs its meaning." *Wallace v. People*, 71 V.I. 703, 715 (V.I. 2019) (citation omitted). Furthermore, "[a] statute should not be construed and applied in such a way that would result in injustice or absurd consequences." *Gilbert v. People of Virgin Islands*, 52 V.I. 350, 356 (V.I. 2009) (citation omitted). Here, the statutory text is plain and unambiguous: "A person who sells or furnishes alcoholic beverages to a person of lawful drinking age does not thereby become liable for injury or damage caused by or resulting from the intoxication of such person." 8 V.I.C. § 161. The statute does not contain any language that limits or differentiates liability between an injured intoxicated party and affected third persons. Indeed, the statute broadly encompasses and prohibits any injured party from holding liable those who serve alcohol. The Legislature could not have intended to bar third persons injured by the intoxicated person from suing the establishment that overserved alcohol, while permitting suit by the intoxicated, injured person. The statute intends to shift responsibility for over-intoxication from the establishment to the patron. If the Legislature intended to restrict liability to a class of persons, it would have included such language. Any other interpretation would

---

[61] Pl.'s Opp'n to Omnibus Mot. In Limine at 2.

lead to an absurd result. Accordingly, the statute bars Bloch from asserting that Defendant is liable for overserving him alcohol and, thereby causing his injury.

¶ 63    Alternatively, Plaintiff argues that, even if the statute bars a claim for liability against Defendant, Plaintiff is still entitled to rebut Defendant's affirmative defense of intoxication. Specifically, Plaintiff asserts that, pursuant to 5 V.I.C. §1451, "the jury should be permitted to consider [Bloch's] level of fault with that of Mafolie in overserving him, because it did not have a TIPS program that could have and should have led its servers to realize the Plaintiff was inebriated."[62] However, to permit the jury to apportion a lesser degree of fault on Plaintiff would simply be another way of assigning liability on Defendant based on overservice of alcohol. This backdoor maneuver would directly conflict with the Legislature's intent to protect establishments from liability for overserving alcohol that leads to a plaintiff's injury. If the jury finds that Plaintiff's injury was due to his intoxication, the apportionment of liability may not be lessened based on Defendant's overservice of alcohol. However, the jury may freely assign liability to Defendant for any negligence it played in Plaintiff's injury as a result of a defect in the premises, here, a low guardrail. Therefore, the Court will prohibit Plaintiff from arguing that Defendant negligently overserved alcohol to Bloch or presenting evidence that Mafolie failed to train employees under TIPS.

## I.  Motion *In Limine* to Bar Expert Testimony that Plaintiff Would Not Have Fallen Over the Railing Had it Been Forty-Two Inches

¶ 64    Defendant asserts that Plaintiff's expert should be barred from opining that she does not believe Bloch would have fallen over the guardrail at Mafolie had it measured forty-two inches.

---

[62] Pl.'s Opp'n to Omnibus Mot. In Limine at 3.

Specifically, Defendant contends that Plaintiff's liability expert, Rosie Mackay ("Mackay"), is unqualified and fails to provide a reliable methodology to form her opinion. The Court disagrees.

¶ 65    First, the Court finds that Mackay is qualified as a safety expert to opine on whether Mafolie's guardrail falling below minimum safety standards was a cause of Plaintiff's accident. A witness is qualified as an expert if the witness has "specialized expertise," through education, training, or simply real-world experience. *Halliday v. Cruise Ship Excursions, Inc.*, 2016 V.I. LEXIS 266, *5 (V.I. Super. Ct. 2016). "Expert testimony must be rooted in the expert's scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue." *Samuel*, 64 V.I. at 524 (citation omitted). Thus, a qualified expert must have the expertise or specialized knowledge that pertains to an issue in the case.

¶ 66    Mackay's expertise in safety codes is pertinent to the issue of whether Bloch would not have fallen over the guardrail had it been built to minimum safety standards. Defendant argues that "while Mackay is an engineer, she has no training in biomechanics, human factors, or accident reconstruction."[63] Defendant asserts that Mackay may opine "on safety standards and whether she believes Defendant fell below those standards, but she lacks the expertise to opine whether a forty-two inch railing would have prevented Plaintiff from going over the railing."[64] In fact, Mackay's extensive resume shows that she is an experienced "safety engineer" who has certified training for premises safety standards such as the OSHA. Through her knowledge of safety standards, Mackay explained that "virtually every safety code [] requires a 42 inch guardrail to be placed wherever there is a drop-off of 48 inches or more."[65] She expounded that "this standard was adopted only after appropriate research and testing was done" in order "to determine whether this was the proper

---

[63] Def.'s Omnibus Mot. In Limine at 8.
[64] *Id.*
[65] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine, Ex. 2 at 8.

height to prevent persons from falling over the guardrail."[66] Accordingly, based on the safety codes and her "own personal observations of such guardrails," Mackay opined that she "would not expect Peter Bloch to fall over a properly installed guardrail that meets the known safety code height of 42 inches."[67] Thus, regardless of whether Mackay has training in "biomechanics, human factors, or accident construction," she nonetheless has specialized knowledge in safety standards to support her opinion.

¶ 67     Moreover, her opinion is not merely speculative, but rather it is based on reliable methodology applied in the creation of such safety standards. The Court has "considerable leeway in deciding how to determine whether particular expert testimony is reliable." *Arvidson*, 72 V.I. at 78 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In determining reliability, the Court may consider factors such as "whether the opinion can be (and has been) tested . . .and the existence and maintenance of standards controlling the technique's operation." *Antilles*, 64 V.I. at 416 (citing *Daubert*, 509 U.S. at 593-94). "No one factor is dispositive" and "[a]s such, the Court's inquiry must focus solely on principles and methodology, not on the conclusions generated therefrom." *Jackson*, 47 V.I. at 126 (citing *Daubert*, 509 U.S. at 595). "Reliability requires a detailed inquiry into the methodology used to form the expert's conclusion. This inquiry ensures that the methodology is grounded in good science based on more than mere subjective belief or unsupported speculation." *Callwood*, 2014 V.I. LEXIS 11 at *8 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 n. 8).

¶ 68     In this case, Mackay's opinion is "grounded in good science." Mackay explained that "[t]he anthropometric data used to calculate the 42 inch height [in the safety codes] confirms that this

---

[66] *Id.*
[67] *Id.*

height would protect someone 6" 2" tall, Peter Bloch's height."[68] The codes relied upon include

national safety codes, "such as OSHA or the International Building Code."[69] Defendant points out,

however, that "Mackay admittedly performed no analysis or calculations to test her theory that a

forty-two inch railing would have prevented Plaintiff from falling over the side."[70] Yet, as Mackay

explained, the safety "standards are adopted so they can be relied upon by property owners to

protect persons such as the Plaintiff in this case, Peter Bloch, from falling over them, without the

need for additional testing each time such a guardrail is installed."[71] Therefore, Mackay's opinion

that Bloch would not be expected to have fallen had the guardrail been up to safety standard height

is based on reliable, tested, and standardized scientific principles rather than mere subjective belief.

Thus, the Court will not bar Mackay's testimony.

### J.  Motion *In Limine* to Bar Evidence of Liability Insurance

¶ 69    Defendant argues that although it "intends to introduce evidence that Plaintiff inspected

the subject premise for safety while working for Tunick on behalf of an insurance company,

Plaintiff must not be permitted to use this to introduce evidence of insurance coverage or policy

limits."[72] Plaintiff asserts, however, that Defendant has opened the door to the introduction of

liability insurance and that, therefore, Plaintiff must be able to explain Bloch's actions in rebuttal

for a purpose other than proving Defendant's negligence. Plaintiff and Defendant have stated that

they do not intend to introduce evidence of an insurance liability policy.

¶ 70    The Court agrees with Defendant to the extent that Plaintiff may not reference liability

insurance to prove Defendant's negligence; however, Plaintiff may reference the insurance

---

[68] *Id.*

[69] *Id.*

[70] Def.'s Omnibus Mot. In Limine at 10.

[71] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine, Ex. 2 at 8.

[72] Def.'s Omnibus Mot. In Limine at 10.

company for another purpose. "Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." V.I. R. Evid. 411. Here, it appears that Defendant intends to submit evidence concerning Bloch's previous inspection in 2022 of the Mafolie premises on behalf of Tunick Insurance Agency. According to Bloch, he conducted the safety inspection "so that the insurance company will have information about the property in order to insure it."[73] Bloch noted that before "going to the Mafolie site in 2022, [he] had never received any training in premises safety and had no idea there were safety requirements for guardrails of a certain height where there was a drop off below."[74] Bloch further identified two prior safety reports he reviewed that did not mention "any safety deficiency due to the lack of a guardrail anywhere on the property."[75] Ultimately, Bloch similarly failed to note in his report recommendations that Mafolie should install a sufficiently tall guardrail.

¶ 71    Therefore, Plaintiff asserts that, "once Mafolie opens the door, the facts related to Plaintiff's inspection are relevant to explain why the Plaintiff cannot be faulted for Mafolie not having a guardrail on its stairway."[76] Specifically, Plaintiff argues that Bloch "did not include a recommendation regarding the need for a guardrail on this stairway, as neither Tunick nor the insurance company (which relied on this report to insure the property), ever provided the Plaintiff with any safety training, or require that he have any such safety experience."[77] Thus, Plaintiff is

---

[73] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine, Ex. 2 at 8.
[74] *Id.*
[75] *Id.*
[76] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine at 10.
[77] *Id.*

not referencing liability insurance to prove Defendant's negligence. Instead, the insurance

company is mentioned indirectly as part of the safety inspection that Bloch conducted on its behalf.

¶ 72    Moreover, Plaintiff simply seeks to rebut and explain the whole circumstance that

Defendant intends to put into evidence in the first place.  It is well-established that

> Traditionally, this is also known as the "open door" doctrine. When a
> party opens the door to evidence that would be otherwise inadmissible, that party
> cannot complain on appeal about the admission of that evidence. However, the
> "open door" doctrine's soundness depends on the specific situation in which it is
> used and thus calls for an exercise of judicial discretion. The Court may limit any
> rebuttal evidence if it does not directly contradict the evidence previously received,
> or goes beyond the necessity of removing prejudice in the interest of fairness. As a
> result, even were the Court to permit use of the suppressed evidence, counsel for
> Defendant would take a calculated risk when inquiring into that evidence.

*People v. Maharaj*, 2016 WL 7637289, *3 (V.I. Super. Ct. 2016). Accordingly, it would be unfair

to permit Defendant to open the door by introducing evidence that references liability insurance

but deny Plaintiff the ability to rebut Defendant's arguments with the same. Therefore, the Court

shall not bar Plaintiff from referencing the insurance liability company to the extent that such

reference is used only to explain Plaintiff's role in the safety inspection and not to impute an

inference of negligence on Defendant's part.

### K.  Motion *In Limine* to Bar Evidence of Subsequent Remedial Measures

¶ 73    Defendant asserts that Plaintiff should not be allowed to introduce evidence of the remedial

measure taken by Mafolie: the recent installation of a higher guardrail. The Court agrees, finding

that none of the exceptions to the rule barring evidence of subsequent remedial measures applies.

Rule 407 of the VIRE states:

> When measures are taken that would have made an earlier injury or harm less likely
> to occur, evidence of the subsequent measures is not admissible to prove:
> negligence; culpable conduct; a defect in a product or its design; or a need for a
> warning or instruction. But the court may admit this evidence for another purpose,

such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

¶ 74    Mafolie's recent installation of a higher guardrail is evidence of a subsequent remedial measure, which supports Plaintiff's argument that injury would not have or would have been less likely to occur had the guardrail been sufficiently tall at the time of the accident. Whether Defendant agrees that this remedial measure was in fact necessary is irrelevant to the question of admissibility. Defendant does not dispute ownership, control, or the feasibility of taking such a precautionary measure. Thus, Plaintiff must either use this remedial measure for impeachment or other valid purposes aside from proving Defendant's fault.

¶ 75    Plaintiff asserts that it should be allowed to impeach Defendant's liability expert, Joe Barnes ("Barnes"), for his opinion denying the need for a guardrail meeting the minimum height asserted by Plaintiff. In Barnes's report, he concluded that "while the railing height could be improved to meet contemporary standards in a newly constructed setting, it played no causative role in this incident."[78] In his deposition, he further denied that a guardrail of at least forty-two inches was necessary to prevent people from falling over. Thus, Plaintiff contends that through the subsequent installation of the higher guardrail by Mafolie, Barnes's "credibility has been undermined."[79] However, the subsequent installation of the higher guardrail does not necessarily render Barnes's opinion incredible. As Barnes explains, it is possible that "[t]he fall resulted from

---

[78] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine: Ex. 3 at 16.
[79] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine at 12.

Mr. Bloch's impaired state and unsafe conduct."[80] Thus, the Court shall not permit Plaintiff to introduce evidence of this subsequent remedial measure for impeachment purposes.

¶ 76    Furthermore, the Court is unpersuaded by Plaintiff's argument that such a subsequent measure is admissible to allow Plaintiff to "fully respond to Mafolie's argument that Plaintiff did a prior inspection, suggesting he is at fault in this case."[81] The Court will permit Plaintiff to rebut Defendant's arguments concerning Bloch's safety inspection of the premises; however, Plaintiff may not do so with evidence of the subsequent installation of the higher guardrail. Such evidence is unduly prejudicial to Defendant, as the probative value is slight in comparison to the potential for a jury to place fault on Defendant based solely on the subsequent remedial measure. *See* V.I. R. Evid. 403 (the Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice"). Accordingly, Plaintiff is barred from mentioning Defendant's subsequent remedial measure of installing a higher guardrail.

### L.  Motion *In Limine* to Bar Plaintiff from Introducing Medical Illustrations into Evidence

¶ 77    Defendant asserts that Plaintiff must be barred from presenting demonstrative medical illustrations of Bloch's injury because they lack foundation and Plaintiff's counsel would be required to "act as a witness to verify who made the illustrations."[82] The Court is unpersuaded by these arguments. Rule 1006 of the Virgin Islands Rules of Evidence states:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available

---

[80] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine, Ex. 3 at 16.

[81] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine at 13.

[82] Def.'s Omnibus Mot. In Limine at 20.

for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Rule 1006 is derived from Federal Rule of Evidence 1006, which provides the following instructive explanatory note:

> Rule 1006 allows the contents of voluminous writings which cannot conveniently be examined in court to be presented in the form of a chart, summary, or calculation. It creates an exception to Rule 1002, which requires that originals be used to prove the content of writings, recordings and photographs. Evidence admitted under Rule 1006 must be otherwise admissible and remains subject to the usual objections under the rules of evidence and the Constitution. Most notably, Rule 1006 evidence normally is objectionable *if the voluminous source material on which it is based is inadmissible*. The proponent must show that the voluminous source materials are what the proponent claims them to be and that the summary accurately summarizes the source materials.

*In re Asbestos, Catalyst, & Silica Toxic Dust Exposure Litig.*, 68 V.I. 494, 502-03 (V.I. Super. Ct. 2018) (citing FRE 1006) (emphasis added).

¶ 77    Plaintiff's demonstrative exhibit summarizes the injuries sustained by Bloch as described in the voluminous records produced by the hospitals that treated him. Plaintiff has produced these records to opposing counsel and intends to mark them as exhibits at trial. The Court does not find that laying the foundation or verification of this demonstrative illustration would be problematic unless the voluminous records on which the illustration is based are inadmissible. Plaintiff must simply demonstrate that the medical records are what he claims them to be and that the illustration accurately summarizes those records. Plaintiff may satisfy this requirement by introducing one of Plaintiff's physicians' testimony, which provides that he reviewed and approved the illustration as being a "reasonable and accurate representation."[83] Accordingly, the Court shall not bar Plaintiff

---

[83] Pl.'s Opp'n to Def.'s Omnibus Mot. In Limine, Ex. 9 at 56.

from introducing a demonstrative medical illustration unless, at trial, the records upon which the

illustration is based are shown to be inadmissible.

## IV.    CONCLUSION

¶ 79    For all the reasons stated above, the Court shall issue an order consistent with this

Memorandum Opinion granting, in part, and denying, in part, the parties' several motions *in*

*limine*.

Dated: January 15, 2026

**HON. CAROL THOMAS-JACOBS**
Judge of the Superior Court
of the U.S. Virgin Islands

ATTEST
Tamara Charles
Clerk of the Court

By: _____
Laytoya Camacho
Court Clerk Supervisor __/__ / __15__ / __2026__